*In re* MARRIAGE OF CYNTHIA PETRAITIS, Petitioner-Appellee, and THOMAS PETRAITIS, Respondent-Appellant.

First District (5th Division) Nos. 1—90—3277, 1—91—1242 cons.

Opinion filed August 20, 1993.

Samuel J. Cahnman, of Chicago, for appellant.

Philip A. Jackman, of Galena, for appellee.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Respondent Thomas Petraitis appeals from that portion of an August 1, 1990, judgment of dissolution of marriage entered in the circuit court of Cook County which granted custody of the couple's minor child, Quentin Petraitis, to petitioner Cynthia Petraitis. Respondent also appeals from a March 21, 1991, order modifying the judgment of dissolution by ordering Thomas to pay to Cynthia one-half of all pension benefits paid to Thomas in the future based on his earnings during the marriage.

The parties were married in 1971. Five children were born to them during the marriage: Anton in 1972, Justin in 1975, Lauren in 1976, Barron in 1977, and Quentin in 1979. Cynthia filed a petition for dissolution of marriage on June 28, 1985. She sought custody of all five minor children. Thomas filed a counterpetition for dissolution on July 13, 1985. The two causes were consolidated.

After the parties filed for dissolution, Anton lived with the father in Chicago while the four younger children lived with the mother in Galena, Illinois. In April 1988 the four younger children came to live with Thomas, at Cynthia's request. Thomas was subsequently awarded temporary custody of the five children by agreed order.

On August 19, 1988, Cynthia filed for temporary custody of the couple's daughter, Lauren. A September 29, 1988, order gave the couple temporary joint custody of the five children with Cynthia as residential parent of Lauren and Thomas as residential parent of the four boys.

A temporary custody hearing began on August 28, 1989. The trial judge conducted an *in camera* examination of each child. Anton and Justin expressed a preference for living with their father. Lauren, Barron and Quentin wished to live in Galena with their mother.

At the temporary custody hearing, the court heard the testimony of Dr. David Busby, a psychiatrist who had interviewed the parents and each child pursuant to a Rule 215 (134 Ill. 2d R. 215) order, Thomas having been ordered to pay Dr. Busby's fee. Dr. Busby testified that Lauren was emotionally retarded and in need of discipline and that Quentin suffered from attention deficit syndrome (oppositional disorder with hyperactivity). On direct examination, Dr. Busby testified that Quentin needed special classes because of his emotional disorder. He opined that Cynthia would be unable to give Quentin the parenting and additional time and structure he needs and that Thomas had a better chance of getting Quentin to respect authority, which was important for Quentin's well-being. If Cynthia was awarded custody of Quentin, Dr. Busby predicted initial superficial improvement followed by deeper hyperactivity and oppositional behavior. He also predicted it was "highly possible" Quentin would be allowed to do anything he liked while in Cynthia's care.

On cross-examination, Dr. Busby was questioned as to sources used in reaching his opinion. Although he interviewed each child and the parents and reviewed a court services report, he relied heavily on information supplied by a longtime friend of the Petraitis family, James Stadelman, whom Dr. Busby had contacted at Thomas' suggestion. Dr. Busby spent 6 1/2 hours interviewing Mr. Stadelman. The only other nonparty contact was a short telephone interview with Cynthia's mother. Dr. Busby also relied on a diary of Cynthia's provided by Mr. Stadelman. Dr. Busby stated that, in arriving at his opinion about custody, he had taken into account the close friendship between Thomas and Mr. Stadelman. He was aware of a pending lawsuit by Mr. Stadelman against Cynthia, as Mr. Stadelman had also provided him with Cynthia's deposition in that lawsuit.

Dr. Busby admitted that the atmosphere of Galena where the mother resides might be superior to that of Chicago in some respects. However, his opinion was that the father would be better able to provide Quentin with necessary authority and control. Dr. Busby believed that the five children should be together in their father's custody. Dr. Busby conceded that, if time had permitted him to interview other persons with knowledge of the family situation, he might have reached different conclusions.

Mr. Stadelman testified that he had been a frequent visitor in the marital home and continued to visit Thomas. He recounted certain conduct by Cynthia, such as use of alcohol and drugs and incidents with men. This testimony regarding Cynthia pertained only to events prior to the institution of dissolution proceedings, as Mr. Stadelman admitted he had not spoken with Cynthia since 1985.

Mr. Stadelman said that in April 1988, when Cynthia delivered the children to Thomas' care, Quentin told Mr. Stadelman that he liked Galena because he could do whatever he liked there. Quentin struck Mr. Stadelman and was otherwise disrespectful to him and to Thomas, but after being in Thomas' care for a while, Quentin's behavior improved.

Mr. Stadelman testified about the grounds of his lawsuit against Cynthia, alleging that he gave her $1,200 to buy stocks in trust for the children, the interest to be used to purchase gifts for the children on special occasions. Mr. Stadelman claimed that, contrary to his instructions, Cynthia had cashed in the stocks. Mr. Stadelman revealed that he had paid Dr. Busby $855 for the time spent with him on this case.

Keith Kessler also testified for Thomas at the temporary custody hearing. Mr. Kessler was a clinical social worker at St. Joseph Carondelet school in Chicago where Quentin had been a student since May 1989. St. Joseph's is a school for emotionally disturbed children which is in session 11 months of the year. Mr. Kessler stated that he met with Quentin twice weekly for therapy, that Quentin was forming an attachment to him, and that Quentin was troubled by the custody proceedings and seemed depressed. In Mr. Kessler's opinion, Quentin would need a stable therapy situation during the dissolution proceedings and for a time afterwards. All other things being equal, Mr. Kessler thought it would be advantageous for Quentin to attend St. Joseph's. Quentin had presented no behavior problems while at St. Joseph's. Mr. Kessler was unfamiliar with the environment at Cynthia's home in Galena. He expressed no opinion about which parent should have custody.

Cynthia's sister, Dolores Glytas, testified on Cynthia's behalf that

Cynthia had a very loving relationship with the children. She did not think Quentin was emotionally disturbed. She had not observed Thomas' parenting skills since the couple separated.

Christian Edwards, Cynthia's adult daughter from a previous marriage, testified to her poor relationship with Thomas during the 12 years she lived in the marital home as a child. She said that Thomas never conversed with her on a personal level. He took his meals in the living room while the family ate in the kitchen. Christian also testified that Thomas drank alcohol daily when she lived in the marital home. Thomas did not participate in activities with his children except for hunting trips with the boys. He owned many guns which he showed to the children. Christian said that Cynthia was the disciplinarian in the marital home. Thomas disciplined the children only occasionally, always in a physical manner.

Christian stated that on one occasion in 1988, while the children were in their father's custody and Christian no longer lived with them, she saw Barron alone and unsupervised at a carnival very late at night. She also stated that the children call her for help with homework.

Cynthia was called as an adverse witness. She admitted to spending the money which Mr. Stadelman had given her. She stated that she brought the children to Thomas in April 1988 because she was being evicted from her home and had no money to support them, although she was employed. She stayed with a female friend in May and moved into a home purchased by her mother in June 1988. Cynthia admitted to paying part of the closing costs for the mother's house.

Cynthia acknowledged an incident in Galena in which Quentin wielded a knife. She denied telling Quentin to run away when Thomas came to pick him up after visitation. Cynthia testified that she can discipline Quentin better than Thomas can.

The court awarded temporary custody of Anton and Justin to the father and temporary custody of Barron, Lauren, and Quentin to the mother in a September 18, 1989, order which also required that Quentin continue counseling.

On February 26, 1990, the parties reached a settlement agreement on all issues except permanent custody of Quentin. Proceedings to determine permanent custody of Quentin commenced that day.

Cynthia testified that, despite the court order that Quentin receive counseling, he had not received counseling immediately. She stated that the principal at Quentin's school in Galena had refused to provide counseling for Quentin, as he did not think there was a school problem. She requested psychological testing to determine if Quentin

should be placed in a slower group at school. In January 1990, Quentin began receiving counseling from the Jane Addams Center in Galena. A psychological evaluation showed that Quentin needed challenges in his schooling.

Cynthia observed that Quentin had been upset and less interested in school since returning to Galena after a Thanksgiving visit with Thomas. He had missed several days of school in Galena. Cynthia said she starts work at 7:30 a.m., so she cannot see that Quentin gets to school every morning. According to Cynthia, one day when Quentin refused to attend school, she asked a passing police officer for assistance. Quentin became very upset and, upon the advice of the counselors at the Jane Addams Center, he was hospitalized for several days at the Singer Mental Health Center (Singer Center). As of the date of the trial, Quentin had been released and was again living with Cynthia in Galena. Cynthia also testified that she had completed a seven-week parenting course.

Thomas testified that Quentin had appeared depressed whenever he returned from visits with Cynthia. When Quentin visited Thomas for Thanksgiving in 1989, Thomas noticed that Quentin was thin, needed a haircut, and was lacking in hygiene. He stated that Quentin does well and is not depressed if he is kept busy. Thomas said he believes Quentin needs constant supervision and special schooling; he tries to participate in many activities with Quentin.

The principal of Quentin's school in Galena, Dale Henze, testified that at first there were no school problems with Quentin. He confirmed that a truancy problem later developed. It was now his opinion that Quentin was emotionally disturbed and that Cynthia could not have controlled his behavior on the day he was admitted to Singer Center.

Mr. Henze said he had heard Cynthia speak negatively about Thomas in Quentin's presence on at least one occasion. Mr. Henze testified that, although there is no special program for severely emotionally disturbed children in the district, a child can be referred for therapy sessions with personnel from the Jane Addams Center who will meet with the child at the school. With parental consent the child's progress will be reported to the school. At the time of the trial, Quentin was receiving such therapy. While he was passing his coursework with grades of D and better, Quentin exhibited what Mr. Henze considered to be unusual behavior in class, such as making faces and holding his arm in the air for an entire class period.

Mr. Henze testified that when he told Ms. Bukata, guardian *ad litem* for the children, that there was no special program in the district and that Cynthia made negative remarks about Thomas in

the children's presence, Ms. Bukata replied that he was ruining things.

Dr. Busby also testified at the permanent custody trial. Since his earlier testimony, he had reviewed the support services report of social worker Donna Soldana which stated that the mother was a fit parent. He had also spoken to Mr. Henze. He had not seen Quentin since his earlier testimony. Dr. Busby again recommended that Thomas be awarded custody of Quentin because of Quentin's need for strict supervision and "close schooling." In Dr. Busby's opinion, Quentin had only a 10% chance of recovery if he stayed in Cynthia's custody, with a probable recurrence of his emotional problems and possible severe depression and suicidal tendency. If Thomas gained custody, Dr. Busby predicted initial resistance and control problems, but eventual recovery.

Ms. Bukata, Quentin's guardian *ad litem*, reported that the mother was a fit and proper person to have custody of Quentin. She also reported that a psychological evaluation by the Singer Mental Health Center showed Quentin had no proclivity toward suicide or homicide and that Quentin's problems could best be handled in his own community.

In announcing his custody decision, the trial judge acknowledged Quentin's history of emotional problems and commented that probably no one could accurately predict that Quentin would not have problems in the future. Since the principal had testified there were no problems when Quentin began school in Galena, the judge found no contemptuous disregard by Cynthia of the court's order that Quentin receive counseling.

The judge said that Dr. Busby's initial predictions about what would happen if Quentin were in his mother's custody had not materialized. He found the testimony of Mr. Stadelman to be biased in the father's favor, particularly in light of Mr. Stadelman's pending lawsuit against the mother. The judge found Dr. Busby's testimony to be biased because of his reliance on information from Mr. Stadelman in formulating his opinion and Mr. Stadelman's payment of $855 to Dr. Busby.

The trial judge stated that he had considered the support services report of Donna Soldana as well as the recommendation of the children's guardian *ad litem*, both indicating that the mother was fit to have custody of Quentin and could provide a good home environment and good schooling for him in Galena. The judge also considered Quentin's desire to live with his mother and the Singer Center's report that Quentin's problems could best be handled in his own community and that Quentin had no proclivity toward suicide or ho-

micide. The judge considered the fact that counseling for Quentin was currently in place in Galena. He found both Cynthia and Thomas were fit parents. He awarded custody to Cynthia with the requirement that she keep Quentin in court-approved counseling.

A judgment of dissolution was entered on August 1, 1990, making the September 18, 1989, custody order permanent by agreement of the parties as to all of the children except Quentin. The father was awarded custody of Anton and Justin; the mother was awarded custody of Barron and Lauren. The court awarded custody of Quentin to his mother with the requirement that Quentin receive court-approved counseling. The judgment of dissolution also stated that, as the parties had agreed, Cynthia's attorney should prepare a qualified domestic relations order (QDRO) which would require Thomas' pension plan to pay directly to Cynthia 50% of the marital portion of the retirement benefits which Thomas would earn as a retired fireman, less any benefits to which Cynthia herself may be entitled under Thomas' pension plan. It appears, however, that this QDRO was subsequently prepared by Cynthia's attorney; but was never signed and entered by the trial judge.

Thomas filed an emergency objection to entry of the custody portion of the judgment relating to the three youngest children, which objection was denied. On August 31, 1990, Thomas filed an appeal from the judgment of dissolution and denial of the emergency objection.

On September 13, 1990, Cynthia filed a motion requesting instructions from the trial court regarding the QDRO. Attached to the motion was a letter from the Laborers' pension board indicating that no pension benefit entitlement existed under the plan for a divorced spouse and that, under section 11—223 of the Pension Code (Ill. Rev. Stat. 1987, ch. 108$^1$/$_2$, par. 11—223), public pension benefits payable to an employee cannot be subject to attachment or garnishment. Therefore, the pension board stated that it did not have authority to comply with a QDRO. The pension board was impleaded on the same day.

On December 12, 1990, the pension board was dismissed from the action. Cynthia moved for reevaluation of the QDRO portion of the judgment of dissolution. The motion sought modification to require Thomas to personally pay the agreed-upon portion of his pension benefits to Cynthia rather than having payments made to Cynthia directly from the pension board. While the date of the reevaluation motion is not shown in the record, the parties do not dispute that it was filed at least 30 days after the December 12, 1990, order. Thomas moved to strike and dismiss Cynthia's motion for reevaluation on the

grounds that it was filed more than 30 days after the December 12, 1990, order, and several months after the dissolution judgment order of August 1, 1990, in violation of section 2—1203 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1203). On March 21, 1991, Thomas' motion was denied and the court ordered Thomas to pay Cynthia 50% of the marital portion of any retirement benefits he receives in the future.

On April 15, 1991, Thomas filed a new notice of appeal in which he appealed the March 21, 1991, order regarding the pension plan. He included in the new notice of appeal the grounds of appeal in the earlier notice of appeal dated August 31, 1990. The two appeals were consolidated.

## CUSTODY

On appeal, appellant contends that the trial court's award of custody of Quentin to Cynthia should be reversed because a finding that such custody was in Quentin's best interest was against the manifest weight of the evidence. In his brief appellant argues three justifications for his position: (1) that the trial judge should have accepted the opinion of the psychiatrist, Dr. Busby; (2) that the record shows a need for special schooling; and (3) that the record shows Cynthia's inability to provide proper parenting for Quentin.

We note, first of all, that section 602 of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) requires the trial judge to determine custody in accordance with the best interest of the child. (Ill. Rev. Stat. 1991, ch. 40, par. 602(a).) That is the court's paramount consideration in child custody cases. (*In re Marriage of Benevento* (1983), 118 Ill. App. 3d 16, 19, 454 N.E.2d 766, 768.) While the best interest of the child is clearly the applicable standard for the trial court, that standard is "illusive and difficult to define, making it subject to varying interpretations and opinions." (*In re C.B.* (1993), 248 Ill. App. 3d 168.) The IMDMA, however, does list seven factors which the judge is to consider in determining the best interest of the child. They are:

"(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved;

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person; and

(7) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." Ill. Rev. Stat. 1991, ch. 40, par. 602(a).

The trial judge has broad discretion in determining custody. (*Benevento*, 118 Ill. App. 3d at 19, 454 N.E.2d at 768.) There is a strong and compelling presumption in favor of the trial court's determination. (*In re Marriage of Macaluso* (1982), 110 Ill. App. 3d 838, 843, 443 N.E.2d 1, 5.) The trial court is in the best position to decide the custody issue because the judge is the one who observes the parties involved and the demeanor of the witnesses and hears and resolves conflicts in the testimony. (*In re Marriage of Soraparu* (1986), 147 Ill. App. 3d 857, 862, 498 N.E.2d 565, 569.) A custody determination necessarily depends on the temperaments, personalities, and capabilities of the parties involved, and the trial court is in the best position to evaluate those traits. (*In Marriage of Felson* (1988), 171 Ill. App. 3d 923, 926, 525 N.E.2d 1103, 1105; *Soraparu*, 147 Ill. App. 3d at 862, 498 N.E.2d at 570.) Therefore, the trial judge's custody determination will not be overturned on review unless that determination is against the manifest weight of the evidence. *Macaluso*, 110 Ill. App. 3d at 843, 443 N.E.2d at 5.

"Manifest weight has been defined as that weight which is clearly evident, clear, plain and indisputable." (*Laroia v. Reuben* (1985), 137 Ill. App. 3d 942, 946, 485 N.E.2d 496, 499.) See, *e.g., In re Marriage of Leopando* (1982), 106 Ill. App. 3d 444, 435 N.E.2d 1312, *aff'd* (1983), 96 Ill. 2d 114, 449 N.E.2d 137 (Trial court's award of custody to the father was against the manifest weight of the evidence where record overwhelmingly supported the mother's contention by demonstrating the mother's constant, active involvement with the child and absence of any such involvement by the father).

First, appellant contends that the trial judge should have accepted the recommendation of Dr. Busby that it was in Quentin's best interest to award custody to Thomas. Dr. Busby testified that, in his opinion, Quentin's mother would be unable to provide Quentin with proper parenting and the discipline and structure which he believed are necessary for Quentin's well-being. Appellant argues that, although a trial court is not required to accept an expert's recommendation as to custody, in this case the court should have accepted Dr. Busby's opinion because it was corroborated by other witnesses and because Cynthia offered no contradictory expert testimony.

It is correct that a trial court need not accept the opinion of an expert in a custody case. (See *Felson*, 171 Ill. App. 3d at 928, 525 N.E.2d at 1106 (custody recommendation from court-appointed Child

Custody Project of the Isaac Ray Center was not binding on the court).) "A recommendation concerning the custody of a child is only that, a recommendation ***. Clearly, a trial court is free to evaluate the evidence presented and accept or reject it in whole or in part." (*Felson*, 171 Ill. App. 3d at 928, 525 N.E.2d at 1106.) That an expert's opinion is not countered by the opinion of another expert does not change that fact.

In *In re C.B.* (1993), 248 Ill. App. 3d 168, an evaluation by two psychiatrists was based on three one-hour visits with the child and only brief observation of the child with the adults who were vying for custody, all such observation in an office setting rather than a home environment. Most of the session time was consumed in collecting background data from the adults. (*In re C.B.*, 248 Ill. App. 3d at 172.) The trial judge found the expert opinion to be unpersuasive and based on inadequate observation. (*In re C.B.*, 248 Ill. App. 3d at 174.) Nevertheless, the judge awarded custody based solely on the expert's recommendation because he believed he was compelled to do so in the absence of expert testimony to rebut the opinion. (*In re C.B.*, 248 Ill. App. 3d at 175.) This court reversed and remanded, finding that the judge failed to use his own discretion by balancing all the factors to be considered in determining the best interest of the child. (*In re C.B.*, 248 Ill. App. 3d at 175.) The court chastened trial judges to remember that "psychiatric expert opinions are only as valid as the bases and reasons supporting them." *In re C.B.*, 248 Ill. App. 3d at 176, citing *In re Violetta B.* (1991), 210 Ill. App. 3d 521, 535, 568 N.E.2d 1345, 1353.

■ Moreover, although appellant argues there was no expert testimony to contradict Dr. Busby's opinion, he overlooks the fact that the Singer Center report and the support services report of social worker Donna Soldana are reports of qualified experts. The Singer Center report was clear in its recommendation that Quentin's problems could best be handled "in his natural community," referring to Galena, where Quentin lived at the time. That report also said, contrary to Dr. Busby's testimony, that Quentin was not suicidal. The support services report of social worker Donna Soldana found, contrary to Dr. Busby's opinion, that Cynthia was a fit parent and that the home and school environment in Galena were good. Thus, in addition to the report of the guardian *ad litem* which recommended that custody remain with Cynthia, the trial court could well rely on the expert evaluations of the Singer Center and Donna Soldana.

We also note that the trial judge, in announcing his decision, made it clear that he found Dr. Busby's testimony to be biased in the father's favor. As reasons for this conclusion, he noted the heavy

reliance on information from Mr. Stadelman in conducting his evaluation and payment received by Dr. Busby from Mr. Stadelman. There is ample evidence in the record to support the trial judge's conclusion that Dr. Busby's opinion was biased. There is also ample evidence in the record to support a belief that Dr. Busby's opinion was unreliable because it was based on minimal time spent with the parents and Quentin and minimal contact with sources other than Mr. Stadelman, whose own testimony the judge viewed as biased.

While it is true that some behavioral problems, which will be dealt with later in this opinion, developed after Quentin moved to Galena, as predicted by Dr. Busby, it was not established that those problems were attributable to Cynthia's inability to provide discipline. There was testimony suggesting that a Thanksgiving visit with Thomas and the anticipated arrival of Thomas to pick up Quentin in Galena might well have precipitated some of the problems. Also, the record reflects that Cynthia was responsible enough to enlist the aid of others, including the Jane Addams Center and, in one instance, the police, to help her in regulating Quentin's behavior. There was also testimony that subsequently Quentin was doing well in Galena. (Dr. Busby had not predicted improvement.)

Appellant's second argument to support his conclusion that the judgment was against the manifest weight of the evidence centers around the issue of Quentin's schooling. He contends that Quentin's success at St. Joseph's coupled with his truancy and behavior problems at the Galena school clearly indicate that, because of Quentin's emotional problems, it was "crucial that Quentin receive special education and not just outside after school counseling." Appellant contends that the trial judge disregarded the fact that the Galena school district offered no special education classes for severely emotionally disturbed children. He also contends that Keith Kessler, a St. Joseph's social worker who counseled Quentin, testified that, because of Quentin's emotional problems, it would be in Quentin's best interest to attend St. Joseph's in Chicago for special schooling.

There appears to have been no consensus that Quentin's condition necessitated special schooling. Dr. Busby was the only witness, other than Thomas, who opined that special education classes were necessary. Dr. Busby had not observed Quentin subsequent to the temporary custody hearing and Quentin's transfer to the Galena school. As previously stated, the trial judge was not required to accept Dr. Busby's expert opinion (see *Felson*, 171 Ill. App. 3d at 928, 525 N.E.2d at 1106), and the trial judge was certainly free to follow the countervailing recommendations of the Singer Center, Donna Soldana, and the guardian *ad litem*.

■ The record reflects that the trial judge was cognizant of the need to deal with Quentin's emotional problems. Thus, when he awarded custody of Quentin to Cynthia, he conditioned it upon Quentin's receiving court-approved counseling. He noted that counseling was already in place in Galena. Although such counseling was not offered through the school, the Jane Addams Center was providing counseling on the school premises and, with parental consent, would provide the school with reports of Quentin's progress. The judge also stated that he intended that the court's resolution of the custody matter would add stability to Quentin's life.

While appellant contends that Keith Kessler testified it would be in Quentin's best interest to attend St. Joseph's, the record reflects that he testified that, all other things being equal, he thought it would be advantageous for Quentin to attend St. Joseph's. He did state that Quentin would need a stable therapy situation. However, Mr. Kessler did not testify that a special school for emotionally disturbed children was necessary for Quentin, nor did he make any recommendation as to custody, as he was unfamiliar with the home and school situation in Galena.

The record shows that Quentin did well at the special school in Chicago and had some behavior problems at the Galena school. However, there was also testimony that Quentin was improving since his release from the Singer Center. The judge noted that the Singer Center had concluded Quentin's problems could best be handled in his own community. The judge stated, "the court cannot predict, nor is there any credible evidence that the outcome of this matter is predictable."

Furthermore, even had the judge concluded that placement in a special school was necessary for Quentin's proper education, the fact that the Galena school system had no program for emotionally disturbed children would not, by itself, have necessitated a change in the award of custody. A child's adjustment to his school and community is only one of the factors which the judge must consider in determining custody according to the best interest of the child. See Ill. Rev. Stat. 1991, ch. 40, par. 602(a)(4).

Finally, appellant argues that the record shows Quentin's mother is unable to provide proper parenting to Quentin. As proof that the mother is not a fit parent, he offers her failure to place Quentin in counseling immediately after the court order to do so, her failure to recognize Quentin's need for educational challenges, her disparaging remarks about Thomas in Quentin's presence, and her inability to discipline Quentin and to regulate his behavior.

■ It must first be noted that both Quentin's guardian *ad litem*

and the social worker who prepared the support services report considered the mother to be fit and proper to have custody and, in fact, recommended that custody be awarded to her. Appellant contends that the guardian *ad litem's* comment to Mr. Henze that he was ruining things shows she is biased in Cynthia's favor. However, the judge was in the best position to determine the reliability of their statements and to give weight to their recommendations accordingly. See *Soraparu*, 147 Ill. App. 3d at 862, 498 N.E.2d at 570; see also *Felson*, 171 Ill. App. 3d at 928, 525 N.E.2d at 1105.

As for the mother's failure to immediately place Quentin in counseling, the judge noted that this was not contemptuous because Quentin's behavior was initially positive at the Galena school and there was an indication that therapy through the school was unavailable. The trial judge observed that counseling was currently in place. Similarly, although Quentin's mother may have initially believed that Quentin should be placed in a less challenging classroom, she did request psychological testing to confirm or refute her hypothesis and she did comply with the results of those tests.

With respect to remarks Cynthia may have made about Thomas in Quentin's presence, evidence in the record is contradictory as to whether Cynthia made such remarks. We will not second guess the trial judge's determinations regarding credibility of witnesses. See *Soraparu*, 147 Ill. App. 3d at 862, 498 N.E.2d at 570 (The judge is in the best position to determine credibility).

Appellant cites *In re Marriage of Thompson* (1983), 96 Ill. 2d 67, 449 N.E.2d 88, *cert. denied* (1983), 464 U.S. 895, 78 L. Ed. 2d 232, 104 S. Ct. 242, and *In re Marriage of Bush* (1988), 170 Ill. App. 3d 523, 525 N.E.2d 163, as support for his position that he should have custody because Cynthia cannot discipline Quentin. The cases cited are distinguishable. In *Thompson*, the reviewing court affirmed the trial court's custody decision, applying the presumption in favor of the trial court's decision, finding no abuse of discretion. (See *Thompson*, 96 Ill. 2d at 79, 449 N.E.2d at 93.) While one witness in that case testified that the child appeared undisciplined after she was taken from her mother, there was also testimony that the mother had not cared for the boy's physical welfare. (*Thompson*, 96 Ill. 2d at 71-72, 449 N.E.2d at 90.) The court appeared to give much more emphasis to the healthy, warm relationship which, by all accounts, existed between the young child and his father. (*Thompson*, 96 Ill. 2d at 79, 449 N.E.2d at 93.) In the present case, there is no contention of neglect as to Quentin's physical well-being which approximates the neglect charges in *Thompson*. Neither was the testimony as to Thomas' relationship with Quentin so unambiguous.

In *Bush*, while the mother was lax in matters of discipline, the focus of the opinion was on the court's application of the "tender years" doctrine. The review court reversed the award of custody to the mother because the trial court had relied upon that doctrine, which applied a presumption in favor of the mother where the child was very young. The court emphasized that there is no longer such a presumption. (*Bush*, 170 Ill. App. 3d at 529-30, 525 N.E.2d at 167.) The "tender years" doctrine has no application to the present case, given Quentin's age, nor was there any contention that the doctrine was applied here.

While there were incidents reflecting uncontrolled behavior by Quentin, including an incident when he wielded a knife, a time when he ran away, and several days when he missed school, there was evidence that preceding some of these incidents there was an encounter with Thomas, or an anticipated encounter with Thomas, which may have precipitated those incidents. Quentin ran away when Thomas arrived in Galena to take him back to Chicago after a visit. A Thanksgiving visit with Thomas occurred immediately before the truancy from school. No details were elicited as to the knife incident except that it occurred shortly after Quentin left his father's home in Chicago to live in Galena. We note that the record does not reflect that any such incidents have occurred since Quentin's release from the Singer Center in January 1990. Moreover, as previously noted, the record shows that Cynthia was responsible enough to enlist the aid of the school, the Jane Addams Center, and, in one instance, the police to help regulate Quentin's behavior and that Quentin has been in counseling continuously since those incidents.

In summary, the record adequately reflects that testimony was heard and consideration was given to the factors listed in the statute. (See Ill. Rev. Stat. 1991, ch. 40, par. 602(a).) The trial judge considered the desire of each parent to obtain custody of Quentin (see Ill. Rev. Stat. 1991, ch. 40, par. 602(a)(1)) and Quentin's desire to live with his mother (see Ill. Rev. Stat. 1991, ch. 40, par. 602(a)(2)), commenting that the wishes of children are a factor in determining custody, but are not controlling. He considered the interaction and the interrelationships between Quentin and his family (see Ill. Rev. Stat. 1991, ch. 40, par. 602(a)(3)), noting that Quentin loved his mother, and finding both parents to be fit and proper for the care, custody and control of Quentin.

The judge also considered the child's adjustment to his home, school, and community (see Ill. Rev. Stat. 1991, ch. 40, par. 602(a)(4)), noting the reports of the support services social worker and the guardian *ad litem* which stated there was a good home environment

with Cynthia and that Galena schools were good for the children. He considered the health of those involved (see Ill. Rev. Stat. 1991, ch. 40, par. 602(a)(5)), finding each parent fit to have custody and paying particular attention to Quentin's emotional health, mentioning Quentin's need for professional care and stability, the observation of Singer Mental Health Center that Quentin's problems were best addressed in his community, and the fact that counseling was already in place in Galena.

There was no evidence of physical violence or threat of physical violence by either parent. (See Ill. Rev. Stat. 1991, ch. 40, par. 602(a)(6).) Regarding the willingness of each parent to facilitate a continuing relationship between Quentin and his other parent (see Ill. Rev. Stat. 1991, ch. 40, par. 602(a)(7)), the judge ordered reasonable visitation and commented that Quentin would continue to need the care and support of both parents.

The judge, having considered the statutory factors in light of the evidence presented and having possessed a superior vantage point for evaluating the temperaments, personalities, and capabilities of the parents and the child (see *Leopando*, 106 Ill. App. 3d at 450, 435 N.E.2d at 1317), decided that, while both parents are fit and proper to have custody, it is in Quentin's best interest that custody be awarded to his mother. The trial court's decision to award custody of Quentin Petraitis to his mother was not against the manifest weight of the evidence.

■ Respondent's notice of appeal states he is appealing the denial of the emergency objection regarding custody of the three children. Respondent, however, neither briefed nor argued this issue, and we see no information regarding the grounds for the objection as it pertains to Lauren and Barron. Therefore, we do not address that issue. See *Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 647, 432 N.E.2d 1267, 1272 (court will not consider point for which no argument is presented).

## MODIFICATION OF JUDGMENT

On appeal, appellant contends that the trial court's March 21, 1991, order which modified the August 1, 1990, dissolution judgment order was void because the trial court no longer had jurisdiction. As previously noted, the August 1, 1990, dissolution judgment order contemplated entry of a qualified domestic relations order (QDRO) to be prepared by Cynthia's attorney. The QDRO would order Thomas' pension board to pay directly to Cynthia 50% of the marital portion of Thomas' pension benefits. Although a QDRO was prepared and presented to Thomas' pension board, it appears the QDRO was never

signed or entered by the trial judge. This conclusion was confirmed by both parties during oral arguments. Evidently, the QDRO was not entered because it was discovered that public pension benefits, such as those to which Thomas will be entitled when he retires as a fireman, cannot be subjected to a QDRO.

As previously stated, the Laborers' pension board, having been impleaded in the case, was dismissed from the case on December 12, 1990. Cynthia later moved for reevaluation of the pension provision in the dissolution judgment order. As a result, the trial court entered its March 31, 1991, order which scuttled the QDRO under which Cynthia would have looked to the Laborers' pension board for receipt of her share of the pension. Instead, the court directed that Thomas personally pay to Cynthia her share of the pension upon his receipt of it.

Appellant contends that because Cynthia's motion for reevaluation was filed more than 30 days after both the dismissal of the pension board and the entry of the dissolution judgment order, the court was without jurisdiction to enter the modification order of March 21, 1991. See section 2—1203 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1203) (allowing motions to modify a judgment if filed within thirty days of the judgment).

The resolution of this issue depends upon whether the portion of the August 1, 1990, dissolution judgment which provides for preparation of a QDRO was a final judgment. A final order must dispose of the rights of the parties as to the entire controversy or some part of the controversy which is definite and separate, so that nothing remains but execution of the judgment. (*In re Marriage of Hillinger* (1986), 146 Ill. App. 3d 549, 553, 497 N.E.2d 112, 115.) "[T]he trial court retains jurisdictions in a case until it has disposed of all matters before the court." *Armour & Co. v. Mid-America Protein, Inc.* (1976), 37 Ill. App. 3d 75, 77, 344 N.E.2d 639, 640.

■ In the present case, the dissolution judgment contemplated entry of an order in the future which would distribute marital property in the form of pension benefits in the proportion agreed to by the parties. The judgment was not self-executing, but contemplated future actions. (See *Comet Casualty Co. v. Schneider* (1981), 98 Ill. App. 3d 786, 424 N.E.2d 911 (order assessing attorney fees in connection with failure to comply with consent decree which contemplated actions later than 30 days after the decree).) No particular time limit was set for preparation and entry of the QDRO. Since it appears that no QDRO had been entered as of March 21, 1991, the matter of distribution of that marital property had not been disposed of, and the court retained jurisdiction to resolve that matter. See *Armour & Co.*, 37 Ill. App. 3d at 77, 344 N.E.2d at 640.

Moreover, even if the August 1990 dissolution judgment were considered final as to the pension distribution, or the QDRO had been entered, the court would still have had jurisdiction to modify. Section 510(b) of the IMDMA states "provisions as to property disposition may not be revoked or modified, unless the court finds the existence of conditions that justify the reopening of a judgment under the laws of the State." (Ill. Rev. Stat. 1991, ch. 40, par. 510(b).) This provision was previously a part of section 510(a). A public pension can be classified as marital property. (See *In re Marriage of Wisniewski* (1982), 107 Ill. App. 3d 711, 437 N.E.2d 1300.) In *In re Marriage of Shelton* (1984), 127 Ill. App. 3d 775, 469 N.E.2d 618, the court stated that the standard to be applied in reviewing the sufficiency of a petition to modify a property distribution was the same as that used for section 2—1401 petitions. (*Shelton*, 127 Ill. App. 3d at 780, 469 N.E.2d at 622-23.) In that case, a dissolution judgment awarded the wife a house and 10 acres of land contiguous to the house to include the garage. (*Shelton*, 127 Ill. App. 3d at 777, 469 N.E.2d at 620.) The reviewing court affirmed the trial court's modification of the judgment based on a petition filed more than 30 days later. The modification was proper because the original order was based on mutual mistake. The trial court found that the parties believed a rectangular 10-acre parcel could be formed to include the house and the garage. (*Shelton*, 127 Ill. App. 3d at 781, 469 N.E.2d at 623.) When it became apparent that such a configuration was not possible, the trial court modified the judgment, albeit after the expiration of 30 days, to award the wife two smaller parcels. (*Shelton*, 127 Ill. App. 3d at 780, 469 N.E.2d at 622.) As in *Shelton*, the modification made in the present case can be justified because the earlier order was based on mutual mistake of the parties as to the enforceability of a QDRO against Thomas' pension plan.

Jurisdiction might also, arguably, be premised on the trial court's inherent power to enter at any time a *nunc pro tunc* order correcting its judgment to do entire justice and to make the judgment speak the truth. (*In re Marriage of Hirsch* (1985), 135 Ill. App. 3d 945, 954, 482 N.E.2d 625, 632.) The errors to be corrected must be clerical or matters of form, not judicial errors. (*Dauderman v. Dauderman* (1970), 130 Ill. App. 2d 807, 810, 263 N.E.2d 708, 710.) A judicial error is one that is the deliberate result of judicial reasoning or decision. (*Dauderman*, 130 Ill. App. 2d at 810, 263 N.E.2d at 711.) The correction must be based on a memorandum or a definite and certain record. *Hirsch*, 135 Ill. App. 3d at 954, 482 N.E.2d at 632 (clarification based on testimony in the record which showed the parties' intent); see also *Dauderman*, 130 Ill. App. 2d at 810, 263 N.E.2d at 710

(memoranda of counsel for both parties suggested periodic payments, so modification was proper to insert "per month" after the alimony amount).

During the prove up of the agreement between the parties, the following colloquy occurred:

> "Mr. Leving (attorney for Thomas): And you understand in the pension [sic] it states that [Cynthia's attorney] will prepare the QDRO so that a percent of the marital portion will go to your wife upon your retirement, less any other benefits she maybe [sic] entitled to under the pension such as spousal benefits et cetera; you understand that?
>
> Thomas Petraitis: Yes, I understand that.
>
> Mr. Leving: So the purpose is that neither [sic] of you receive fifty percent of the total marital benefits. Do you understand that?
>
> Thomas Petraitis: Yes, I understand that."

Although this colloquy is not a model of clarity, we think it is clear that the parties intended that they each receive 50% of the marital portion of Thomas' pension and that the substance of the order is to allocate that marital property to achieve that intended result. Whether payment flows directly from the husband to the wife or from the pension board to the wife under a QDRO can arguably be characterized as ministerial rather than as a judicial decision. Since the method of payment was erroneously designated in the original order and cannot accomplish its intended function, it may well be that a modification of that portion of the order providing for the method of payment could be made on a *nunc pro tunc* basis. (See *Dauderman*, 130 Ill. App. 2d at 810, 263 N.E.2d at 710 (Matters of form which are not the deliberate result of judicial reasoning and determination can be corrected by *nunc pro tunc* order); see also *Hirsch*, 135 Ill. App. 3d at 950, 482 N.E.2d at 632 (*nunc pro tunc* order proper to add clarification that no offset was to be applied to amount husband had been ordered to pay).) Accordingly, an argument can well be made that, in addition to the fact that the dissolution judgment order was not final, and in addition to the fact that modification could be made under section 510(b) of the IMDMA, revision could also be made by a *nunc pro tunc* order.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McNULTY and COUSINS, JJ., concur.