2021 IL App (1st) 190913-U

No. 1-19-0913

Order filed March 31, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| JOYCE CECELIA KENNEDY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 18 P 5845 and |
| | ) | 18 P 6143, cons. |
| CHARRYL Y. TATE, | ) | |
| | ) | Honorable |
| Respondent-Appellee. | ) | Carolyn J. Gallagher |
| | | Judge, Presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Presiding Justice Mary Mikva and Justice Maureen Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's order granting guardianship of the minor to Tate was in the best interest of the child and was not against the manifest weight of the evidence.

¶ 2    Petitioner Joyce Cecelia Kennedy (Kennedy) appeals from an order of the circuit court which granted respondent Charryl Tate's (Tate) petition for guardianship of the minor child, M.W. On appeal, petitioner contends that the circuit court's decision to deny her cross-petition for guardianship of M.W. and to grant guardianship to Tate was an abuse of discretion, and that its

decision that Tate's guardianship was in the best interests of the child was against the manifest weight of the evidence. For the following reasons we affirm.

¶ 3 This case is taken on the appellant's brief only pursuant to the principles set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 131-33 (1976). The record here is straightforward, and the claimed errors are such that we can easily decide them without the aid of an appellee's brief, therefore we will decide the merits of the appeal. *Id.* at 133.

¶ 4                                     BACKGROUND

¶ 5 Monterae K. Hardin (Hardin) gave birth to Madison Wills (M.W.) on November 4, 2014. The birth certificate did not indicate paternity. However, Hardin advised relatives that M.W.'s father was Steven D. Wills, Jr. (Wills), whose parentage was confirmed by a DNA test in 2018.

¶ 6 For the first part of M.W.'s life, she and Hardin lived with Kennedy, the minor's maternal great-great-aunt. Later, they moved into the home of Hardin's abusive boyfriend, who reportedly killed Hardin on August 10, 2018. During the next few weeks, M.W. was cared for by Kennedy and other maternal relatives.

¶ 7 At the time, Wills was serving a 10-year sentence on a non-violent drug-related conviction. Four days after Hardin's death, he executed a document titled "Temporary Guardianship Agreement" in which he purported to relinquish physical custody of M.W. to Tate for the remainder of his incarceration. On Labor Day, about 25 days later, Tate picked up M.W. from Kennedy purportedly to take her to visit Wills and take pictures with him; but she never returned M.W.

¶ 8 On August 21, 2018, a Petition for Guardian of Minor was filed by M.W.'s great-aunt, LaVanya Hardin-Wright (Hardin-Wright). On August 31, 2018, Tate filed a motion contesting the

guardianship petition. On October 15, 2018, Kennedy filed her Cross-Petition for Guardianship. Subsequently, on October 31, 2018, Hardin-Wright moved to voluntarily dismiss her petition which was subsequently granted by the circuit court on November 1, 2018. The record also indicates that Tate subsequently filed a petition for guardianship of M.W. in a separate proceeding under case number 2018 P 6143; that petition is not contained in the record.

¶ 9       On September 10, 2018, the circuit court entered orders which: (1) authorized Tate to retain custody of M.W. until further order of the court; (2) required visits between M.W. and Kennedy's family; (3) appointed Byron L. Mason as M.W.'s guardian *ad litem* (GAL) pursuant to section 11-10.1(b) of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11-10.1(b) (West 2018)); and (4) consolidated case number 2018 P 6143 into the present case, 2018 P 5845.

¶ 10      On December 5, 2018, the circuit court ordered Tate and Kennedy to evenly divide custody until the entry of an order of guardianship. On January 10, 2019, the circuit court ordered that the parties were authorized to jointly seek traumatic grief counseling through Dr. Nicole Tefera, (Dr. Tefera) the minor's clinician and follow the recommendations set forth in Dr. Tefera's report dated January 9, 2019.  By February 15, 2019, the GAL had submitted two reports that summarized his interviews with M.W., Tate, Kennedy, other family members, the daycare provider, and M.W.'s psychologist.[1] He ultimately recommended that Tate's guardianship petition be granted.

¶ 11      On February 20 and 27, 2019, the circuit court held a hearing on the Tate and Kennedy petitions. Several witnesses testified at the hearing.

---

[1] Although the circuit court states that they received two reports, the record only reflects one written preliminary report from GAL Mason.

¶ 12    M.W.'s therapist, Dr. Tefera, testified that she was a licensed clinical psychologist with Advocate Children's Hospital. Beginning November 2018, Dr. Tefera conducted weekly one-hour sessions, focused on trauma, with M.W.  Dr. Tefera was helping M.W. process her grief and express her thoughts and feelings about Hardin's death. She explained that for the stability of M.W.'s mental health, M.W.'s concerns about what happened to Hardin must be acknowledged and validated, not suppressed. Furthermore, M.W. must be effectively bolstered in maintaining her memories of Hardin while strengthening her connection with Wills.

¶ 13    Based thereon, Dr. Tefera recommended stabilization and security. She said it was critical that M.W.'s guardian continue therapy, collaborate in addressing the trauma, help create a shared narrative, and otherwise actively engage in fostering M.W.'s recovery, regardless of who was appointed guardian.

¶ 14    GAL Mason testified that upon his appointment, he was instructed to investigate and make a recommendation to the circuit court as to M.W.'s best interests. GAL Mason testified that he had sufficient time to investigate this matter, and that he reviewed the facts, conducted interviews, and had conversations with Kennedy, Tate, and Dr. Tefera on multiple occasions prior to making a recommendation.   Based on relevant factors including his interviews and observations, the ages of the petitioners and M.W., and the fact that Wills appear to be involved with M.W., GAL Mason made the following recommendations to the circuit court: (1) grant Tate's petition, and (2) encourage Tate to facilitate continued active and robust relationships between M.W. and members of the Kennedy family.

¶ 15    Tate testified that she was 48 years old, employed at Northwestern Memorial Hospital in the Emergency Department, and living with three of her adult children. Since the entry of the

December 5, 2018, order, M.W. has stayed with Tate from Sunday to Thursday each week. Prior to Hardin's death, Tate and Hardin took M.W. to visit Wills in prison. After Hardin's death, Tate continued to take M.W. to see him about twice a month. M.W. and Wills also regularly spoke by phone. Tate described Wills' relationship with M.W. as "great," and testified that Wills supported her efforts to obtain guardianship. Tate testified that if she became M.W.'s guardian, she would provide her with continued love, structure and counseling, and ensure that she continued her strong relationships with Kennedy and her other maternal relatives.

¶ 16    Kennedy, who was 71 years old at the time of the hearing, testified that she resided with her husband and daughter, Tonia King (King), in the suburbs. Kennedy retired from employment in the medical billing and coding field and reported that she was in excellent physical and emotional health. From birth until she was three and one-half years old, M.W. and Hardin lived with Kennedy, during which time Kennedy helped care for M.W. Since the entry of the December 5, 2018, order, M.W. has stayed with Kennedy from Thursday to Sunday each week. Kennedy testified that other maternal family members had close relationships with M.W. and spent time with her. Kennedy further testified that if she became guardian, she would continue to provide stability, constant love, and consistency. As a retiree without employment obligations, she would also volunteer at school, help M.W. with homework, and take her to afterschool activities. She believed that both families would need to work together to support M.W.

¶ 17    King, an early childhood educator, testified that the M.W. enjoyed close and loving relationships with her, her daughter, Kennedy, and other maternal relatives. King believed that returning to Kennedy's home, where the minor lived for most of her life, would provide more stability than would living elsewhere. King stated that Kennedy was in excellent health, but if that

were to change, she would step in as a "secondary" guardian. King described Kennedy as a compassionate person who was committed to her family and had a loving relationship with M.W. She acknowledged that Tate also had a loving relationship with M.W.

¶ 18    Tamaraka King-O'Neal (O'Neal) a developmental therapist, and Kennedy's granddaughter also testified. O'Neal testified that she and Hardin were extremely close. O'Neal stated that she observed a good working relationship between Hardin and Tate, as well as between Hardin and Wills. O'Neal testified that Hardin visited Wills in prison a handful of times with M.W. and that Hardin never kept M.W. and Wills from each other. O'Neal stated that she knew what Hardin would have wanted because Hardin would tell family members. O'Neal believed Kennedy would be the more appropriate guardian based on the length of time during which the minor lived with her and Kennedy would be fair about visitation with the paternal family.

¶ 19    On March 27, 2019, the circuit court entered an order granting Tate's petition and denying Kennedy's petition, and further ordering that Kennedy should have liberal visitation with M.W. The circuit court relied on the following factors in determining the best interests of the child (1) the GAL's recommendation that the Tate petition be granted; (2) Wills' intent that Tate care for M.W., as expressed in his "Temporary Guardianship Agreement" and described in Tate's testimony; and (3) the fact that Wills would become available to parent M.W. within the next few years upon his release from prison.

¶ 20    Kennedy filed her timely notice of appeal on April 26, 2019.

¶ 21                                ANALYSIS

¶ 22     On appeal, Kennedy contends that the circuit court's decision denying her cross-petition for guardianship of M.W. and granting guardianship to Tate was an abuse of discretion, and that

its decision that Tate's guardianship was in the best interests of the child was against the manifest weight of the evidence. She argues that this was error because the circuit court relied on: (1) the GAL's recommendation when the GAL failed to fully investigate M.W.'s comfortable relationship with Kennedy; (2) Tate's self-serving testimony that Wills' intent was for her to care for M.W.; and (3) the future contingency that Wills will be released from prison and be available to parent M.W. within the next few years. Kennedy further contends that the circuit court should not have limited itself to determining the best interests of M.W. under the Probate Act 755 ILCS 5/11-14.1(b) (West 2016) but should have included the guidelines set forth in the 1983 version of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (Ill. Rev. Stat. 1983, ch. 40, par. 602(a)). Kennedy cites to two older decisions of this court to support this conclusion, *In re Estate of Suggs*, 149 Ill. App. 3d 793 (1986), and *Petition of Schomer*, 89 Ill. App. 3d 92 (1980).[2]

¶ 23    Additionally, Kennedy asserts that the proper standard of review is *de novo* because the issues presented involve only questions of law. Kennedy relied on *Beehn v. Eppard* which held that where the trial court's discretion is based on an erroneous conclusion of law, the proper standard of review is *de novo*. *See Beehn v. Eppard*, 321 Ill. App. 3d 677, 680–81 (1st Dist. 2001) (citing *People v. Williams*, 188 Ill. 2d 365, 369 (1999)).

¶ 24    We first note that Kennedy is incorrect as to the proper standard of review. In cases involving petitions for guardianship, the circuit court assesses the best interests of the child. *In re Custody of H.J.,* 2021 IL App (4th) 200401, ¶ 22. It is well established that the paramount consideration in all guardianship and child custody cases is the best interest of the child. *In re*

---

[2] We note that Kennedy mislabeled the title of this case as *In re Adoption of Scheidt*, 89 Ill. App. 3d 92 (1980).

*Estate of Andre T.*, 2018 IL App (1st) 172613, ¶ 27. A trial court's determination as to the best interests of the child in a guardianship-custody matter will not be reversed on appeal unless the order is against the manifest weight of the evidence. *H.J.*, 2021 IL App (4th) 200401 *at* ¶ 22.

¶ 25    While Kennedy does cite to cases that establish the premise of best interest, she does not expound upon or analogize them to this case; specifically, how those cases support her claims as opposed to Tate's. She instead presents conclusory statements based on her review of the evidence presented at the hearing. Nevertheless, Kennedy clearly contends that she believes that it would have been in the best interest of the child if her petition for guardianship would have been granted. Therefore, we will nonetheless consider her assertions below.

¶ 26    First, we turn our attention to Kennedy's claim that the circuit court was not limited to the Probate Act 755 ILCS 5/11-14.1(b) (West 2016) but should have instead looked to the versions of the IMDMA as used by this court in *Suggs* and *Schomer.*

¶ 27    First, we note that older versions of the IMDMA are no longer the law. The current version became effective in May 2018. See750 ILCS 5/601(a) (West 2018). The current version of the statute was in effect when this case was decided, nevertheless, Kennedy neglected to cite it. Further, we note that Kennedy has failed to cite to any current or recent decisions to support her contention that the IMDMA factors should be used a guardianship case brought under the Probate Act.

¶ 28    Moreover, and contrary to Kennedy's assertions, in *Schomer*, this court found in that it was the best interests of the child that controls and affirmed the trial court's determination. *Petition of Schomer*, 89 Ill. App. 3d at 94. Similarly, in *Suggs*, even though the court applied the factors

contained in the IMDMA, it ultimately relied on the best interests of the child in making its decision. *In re Estate of Suggs*, 149 Ill.App.3d at 796.

¶ 29     In the case at bar, the seminal question continues to be what was in the best interest of the minor child.  We will review the circuit court's award of guardianship to Tate and denial of Kennedy, to determine whether it was against the manifest of the weight of the evidence.

¶ 30     The sole responsibility of the trial court in appointing a guardian is to provide for the best interests and welfare of the minor. *In re Custody of H.J.,* 2021 IL App (4th) 200401, ¶ 22. The court must protect the minor child first; the feelings and desires of the adult parties are inferior in this regard and must yield to the court's obligation to protect the best interests of the minor child. *In re Marriage of Russell*, 169 Ill. App. 3d 97, 102 (1988).

¶ 31     A circuit court's determination as to the best interests of the child in a guardianship-custody matter will not be reversed on appeal unless the order is against the manifest weight of the evidence. *In re Violetta B*., 210 Ill. App. 3d 521, 533 (1991).  The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R*., 2017 IL App (2d) 160657, ¶ 16. This is a highly deferential standard of review because "the trial court is in a much better position than is this court to observe the witnesses, assess credibility, and weigh the evidence." *In re T.B*., 215 Ill. App. 3d 1059, 1062 (1991). Consequently, we will not substitute our judgment or "overturn the trial court's findings merely because [we] might have reached a different decision." *T.B*., 215 Ill. App. 3d at 1062. "[I]t is well established that the paramount consideration in all guardianship and child custody cases is the best interest of the

child." *Violetta B*., 210 Ill. App. 3d at 536. These best-interest factors are provided by statute and include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E*., 368 Ill. App. 3d 1052, 1072, (2006). See also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 32    After a careful review of the record, we find that the circuit court's order was not against the manifest weight of the evidence. It was not an unreasonable or arbitrary decision, the opposite conclusion is not clearly apparent, and the court's decision was based on the evidence. *In re B.B*., 386 Ill. App. 3d 686, 698, (2008).

¶ 33    As noted throughout the record, the love for M.W. by both Kennedy and Tate is apparent and unquestionable. The circuit court believed both petitioners were more than capable of providing an active and suitable program of guardianship and M.W. would thrive under either guardianship. The record also indicates that Tate cultivates a relationship between M.W. and her father; Tate took M.W. to see Wills at least twice a month. Additionally, Tate allows M.W. to speak with Wills every other day. Allowing M.W. to foster a relationship with her only biological

parent is valuable and as Dr. Tefera opined, it is important for the minor to stay connected to her father.

¶ 34     GAL Mason also recommended that Tate's petition be granted. GAL Mason testified that he had sufficient time to investigate this matter, and that he reviewed the facts to make a recommendation. GAL Mason further explained that he conducted several interviews. He met with Tate and the minor once, Tate alone at her new home once, and Kennedy and the minor once. GAL Mason also expounded upon the factors used to determine his recommendation. His evaluation was based on several factors, including his observations, interviews with different interested parties, conversations with Dr. Tefera, and conversations with both Tate and Kennedy. In addition, the court stated that the GAL's personal concern for M.W. was evident.  The circuit court found the observations and insights provided in GAL Mason's reports, and the presentation of his findings and recommendations at trial, to be invaluable in making its best interests determination.

¶ 35     Four days after Hardin's death, Wills executed a document entitled "Temporary Guardianship Agreement" in which he purported to relinquish physical custody of M.W. to Tate for the remainder of his incarceration. Despite Kennedy's contention that Wills never gave any testimony in court, the record indicates that the Father wrote a letter articulating his intention that Tate be appointed guardian over M.W., and said letter was notarized at Lincoln Correctional Center.

¶ 36     The record also does not reflect that Tate cannot or will not provide a stable environment. Contrary to Kennedy's contention that M.W. has been subjected to instability because she had to change households twice during the legal guardianship proceedings; Tate had to move from her

previous dwelling because the basement flooded, and her items were destroyed. This was no fault of Tate and it was proper for Tate to move in favor of M.W.'s health and well-being.

¶ 37    Additionally, Tate has been intentional about following the court's order to get M.W. counseling to deal with the death of her mother. Tate has additionally taken the initiative to speak with Dr. Tefera about coping mechanisms. The record states that Tate has consistently brought M.W. to therapy up until the week before trial.

¶ 38    Our review of the record, as summarized earlier, indicates there was sufficient evidence to support the court's decision. Furthermore, in a case such as this, where both parties appear qualified to have guardianship of the minor, observation of the witnesses' demeanor is acutely important. Temperaments, personalities, and other relevant intangible factors simply cannot be gleaned from reviewing the transcript of proceedings. *In re Marriage of Petraitis*, 263 Ill. App. 3d 1022, 1031 (1993). Because the circuit court was in a better position to evaluate these critical factors, we must defer to its discretion and uphold its determination.

¶ 39    The circuit court was not deprived of its ability to make a full and fair assessment of all pertinent circumstances and reach an informed decision on guardianship that was in the best interest of the child. The evidence supported the circuit court's findings that Tate's guardianship was in the best interests of the child. The circuit court's determination was not against the manifest weight of the evidence and the circuit court did not abuse its broad discretion in making such determination.

¶ 40                                  CONCLUSION

¶ 41    For the reasons set forth above, we affirm the judgment of the circuit court of Cook County.

¶ 42    Affirmed.