2020 IL App (5th) 190370-U

NO. 5-19-0370

NOTICE

Decision filed 02/25/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* PATERNITY OF T.A.V., a Minor Child | ) | Appeal from the |
| | ) | Circuit Court of |
| (Kristina M. Fillback, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14-F-637 |
| | ) | |
| Mario A. Austin-Verweij, | ) | Honorable |
| | ) | Patrick R. Foley, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justice Cates concurred in the judgment.
Justice Barberis dissented.

**ORDER**

¶ 1    *Held*: Judgment affirmed where circuit court's decision regarding allocation of parenting time was not an abuse of discretion.

¶ 2    The respondent, Mario Austin-Verweij, and the petitioner, Kristina Fillback, are the natural parents of a daughter, T.A.V., born September 19, 2012. On July 31, 2019, the circuit court entered a "Final Judgment as to Allocation of Parenting Time and Respondent's Request for Relocation of the Minor Child." The order, among other things, denied the respondent's request to be designated as T.A.V.'s primary caretaker and relocate T.A.V. to the U.S. Virgin Islands (Virgin Islands) where he resides. The order went on to grant the petitioner the majority of parenting time, including T.A.V.'s primary residence, and determined that T.A.V. was to attend school in the

1

Greater St. Louis Metropolitan area where T.A.V. had been residing with the petitioner and attending school. The respondent now brings this appeal arguing that the circuit court's July 31, 2019, order was made in error and should be reversed and remanded with instructions to enter an order providing that T.A.V. should attend school and reside in the Virgin Islands.

¶ 3    This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018) which requires that, except for good cause shown, the appellate court issue its decision within 150 days of the filing of the notice of appeal. Accordingly, the decision in this case was due on January 24, 2020. However, upon the respondent's filing of a timely notice appeal on August 27, 2019, the petitioner filed a motion to dismiss appeal, or in the alternative, to stay the appeal. This court denied the petitioner's motion on September 12, 2019. Additionally, due to motions for extensions of time filed by both parties and granted by this court, the briefing schedule was not complete until December 10, 2019. This case was immediately placed on the oral argument docket for January 14, 2020, and we now issue our disposition. For the following reasons, we affirm the circuit court's July 31, 2019, order.

¶ 4                                    I. BACKGROUND

¶ 5    The petitioner and the respondent never married but are the natural parents of T.A.V., born on September 19, 2012. On July 9, 2014, the petitioner filed a petition for custody,[1] requesting a modification of the allocation of parenting time and responsibilities of the parties' daughter. In that petition, the petitioner asserted that she was a resident of Illinois, the respondent was a resident of New York and the Virgin Islands, and T.A.V. had been born in Madison County, Illinois.

_____

[1]The petitioner's "Petition for Custody and Other Relief" was filed in 2014 prior to the enactment of the updated Illinois Marriage and Dissolution of Marriage Act (Marriage Act) on January 1, 2016, which removed the terms "custody" and "visitation" and replaced said terminology with "allocation of parenting time and responsibility." Thus, henceforth in this decision, the terms "custody" and "visitation" will be replaced with the proper terms under the new applicable law.

¶ 6    On August 4, 2014, the respondent filed a special and limited appearance for the purpose of objection and motion to dismiss in St. Clair County, objecting to the court having personal jurisdiction over him as a resident of the Virgin Islands, and subject matter jurisdiction over the issues presented in the petitioner's motion, claiming jurisdiction under the Virgin Island Code because the petitioner was an employee of the respondent's company and filed taxes in the Virgin Islands. In that same filing, the respondent also contended that, after the family visited New York in February and March 2014, the petitioner visited her mother in Illinois with T.A.V., but she never returned to the Virgin Islands. The respondent contended that it was in T.A.V.'s best interest to live with him in the Virgin Islands where "she has family and stable support."

¶ 7    Two additional affidavits were filed regarding whether Illinois courts had proper jurisdiction to hear cases involving T.A.V. On September 16, 2014, the circuit court denied the respondent's motion to dismiss and found that Illinois was T.A.V.'s home state for jurisdictional purposes. The court also determined that (1) the respondent, on a temporary basis, should have parenting time one weekend per month with two weeks prior notice required; (2) the parties should arrange telephone and/or Skype visits; and (3) neither party should remove T.A.V. from the jurisdiction of the court, except to the St. Louis area. On October 9, 2014, the respondent filed a motion to reconsider, alleging that the petitioner had intentionally misled him regarding her intentions to return to the Virgin Islands when she repeatedly told him that she was only temporarily visiting family in Illinois to receive medical care. On February 6, 2015, after the filing of some additional motions unrelated to this appeal, the respondent filed an amended motion to reconsider the circuit court's September 16, 2014, order addressing jurisdiction.

¶ 8    On February 20, 2015, the circuit court held a hearing regarding the issue of subject matter jurisdiction. Following argument and permitted testimony, the court denied the respondent's

motion to reconsider and again determined that Illinois was T.A.V.'s home state. Additionally, the court determined that the petitioner had not engaged in "unjustifiable conduct by returning to the State of Illinois such that this Court should decline jurisdiction pursuant to the UCCJEA." The parties do not raise the issue of jurisdiction in this appeal.

¶ 9 Following the circuit court's initial order regarding parenting time and responsibilities, additional motions were filed challenging the court's temporary allocation. Ultimately, on May 15, 2015, the circuit court entered a joint parenting agreement, agreed to by both parties. The agreement established primary residence or "legal residence" for T.A.V. with the petitioner in Illinois and set forth the respondent's parenting time with T.A.V. by listing specific time periods from June 2015 through September 2018. The agreement also contained the following relevant provision which set forth an expected time that the parties would modify their parenting schedule and choose a school for T.A.V.:

"The parties shall seek to agree by March 1, 2017 on whether the child will commence school based upon the child's readiness in either the 2017-2018 school year or the 2018-2019 school year, the location of the school the child will attend, and the parenting time schedule the [*sic*] to be effective when the child commences school. If the parties cannot agree as to the readiness of the child, the location of the school to be attended by the child, and the parenting time schedule, after mediation as set forth herein, the parties shall commence court review as to the location and school for the child and the parenting time schedule. Until modified by a court order, the parenting time schedule set forth herein remains in effect."

¶ 10 On February 17, 2017, the petitioner filed a motion to modify the joint parenting agreement, requesting T.A.V. attend preschool at Good Shepherd Lutheran School (GSLS) in

4

Collinsville, Illinois, for the 2017-18 school year. The petitioner also requested modification of the parties' parenting time schedule since T.A.V. would attend school on a regular basis.

¶ 11   On February 23, 2017, the respondent filed a motion to compel mediation or, in the alternative, modify parental responsibilities. The respondent asserted that, without response by the petitioner, he had attempted to discuss T.A.V.'s educational plan with her. The petitioner, however, enrolled T.A.V. at GSLS without agreement by him. Instead, the respondent alleged that the petitioner made the decision and then sent him a text message informing him on February 10, 2017. As such, the respondent requested mediation regarding this issue, or in the alternative, for the court to award him residential parental status for T.A.V. to attend school in the Virgin Islands. In response, the petitioner filed a motion to strike the respondent's motion to modify parental responsibilities, asserting that the respondent had failed to properly file a motion for relocation although his alternative prayer for relief in his motion requested residential parental status. The petitioner asserted that because the respondent did not have majority parenting time, he lacked standing to file such motion. She further denied his characterization of their exchange of information relating to T.A.V. attending GSLS. The circuit court then ordered the parties to participate in mediation.

¶ 12   Following the completion of mediation, the respondent filed a motion on November 22, 2017, to withdraw, as moot, his motion to compel mediation, or in the alternative, modify parental responsibilities, given that the court had ordered the parties to participate in mediation, and the parties had complied. He also filed an additional motion for a parenting time evaluation. On December 5, 2017, the circuit court denied the respondent's motion for a parenting time evaluation, but granted his motion to withdraw, as moot, his motion to compel mediation, or in the alternative, modify parental responsibilities. That same day, the respondent filed a motion for removal of child

5

and modification of designation of custodian, requesting that if the court determined schooling was best in the Virgin Islands, that he be allotted the majority of parenting time, with leave to remove T.A.V. from Illinois to the Virgin Islands.

¶ 13    On December 19, 2017, the petitioner filed a motion to dismiss, arguing that the respondent lacked standing to seek removal, pursuant to section 609.2 of the Marriage Act (750 ILCS 5/609.2 (West 2016)), because he did not have the majority of parenting time, and that his motion instead constituted a motion to modify, pursuant to section 610.5 of the Marriage Act (*id.* § 610.5), which required him to plead and prove a change in circumstances that necessitated modification.

¶ 14    On April 13, 2018, the respondent filed a renewed motion for a parenting time evaluation. The respondent asserted that the parties could not agree on schooling, primary residence, and parenting time to provide him with maximum involvement regarding the physical, mental, moral, and emotional well-being of T.A.V.

¶ 15    On May 8, 2018, the respondent also filed a motion for a declaratory judgment requesting that the circuit court declare that the respondent could seek a modification of parental decision-marking responsibility and parenting time. He asserted two grounds for such a declaration. First, that the joint parenting agreement of May 15, 2015, set forth an agreement by the parties for the circuit court to review T.A.V.'s schooling and for modification of the parenting schedule in light of where T.A.V. would attend school. In the alternative, he argued that a change in circumstances was present because of T.A.V.'s change in age (T.A.V. was only 32 months old when the agreed judgment was entered, but was now 6 years old), she had her father's current partner and her two half siblings living in the Virgin Islands, and she had spent a substantial amount of time in the Virgin Islands developing relationships with family and friends. Moreover, the respondent asserted that T.A.V. had been involved in the Virgin Islands community and had acclimated well to that

6

area. The respondent thus requested a modification of the allocation of parental responsibilities and parenting time for T.A.V. relevant to her attending school in the Virgin Islands. Shortly thereafter, on June 5, 2018, the court appointed Dr. Daniel Cuneo as a parenting time evaluator in the matter.

¶ 16 On May 16, 2018, the circuit court held a hearing on the respondent's motion for removal of child and modification of designation of custodian. On July 25, 2018, the circuit court entered an order in which it found that the joint parenting order and agreed order, effective May 15, 2015, were final orders. Thus, the circuit court concluded that modification was controlled under section 610.5 of the Marriage Act (750 ILCS 5/610.5 (West 2016)). As to count I of the respondent's motion for declaratory judgment, the court determined that there was no agreement between the parties to review T.A.V.'s primary residence and denied said count. As to count II, the court determined that the respondent had "the burden to plead and prove that a change in circumstances has occurred since May 15, 2015, and that a modification is necessary to serve the minor child's best interests." The court also determined that the respondent lacked the standing required under section 609.2(b) of the Marriage Act to seek relocation of T.A.V. because he had not been allocated the majority of parenting time or equal parenting time when the motion was presented (*id.* § 609.2(b)). The court went on to state that it would address all the issues of modification of the parenting time schedule, the residence of the child, and relocation in one hearing. The court allowed the petitioner to enroll T.A.V. at GSLS, on a temporary basis, for the 2018-19 school year. A status hearing and final hearing date were set.

¶ 17 On September 26, 2018, the circuit court awarded the respondent additional temporary parenting time in October, November, and December 2018, and ordered Dr. Cuneo to provide his

parenting time evaluation by November 1, 2018. All other provisions in the May 15, 2015, order remained in effect.

¶ 18    On February 4, 2019, the respondent filed a motion to set temporary parenting time because the prior temporary parenting order had ended and no parenting time had been set by the circuit court. Moreover, the respondent asserted that the parties had been unable to agree on temporary parenting time. In response, the petitioner agreed with the respondent that the court needed to set temporary parenting time.

¶ 19    On May 17, 2019, the circuit court entered an order awarding the respondent additional parenting time from June 5, 2019, until June 21, 2019. T.A.V. was to return to Illinois on June 17, 2019, and remain in Illinois until the conclusion of the trial. A five-day trial, from June 17, 2019, to June 21, 2019, took place. The issues before the circuit court were parenting time, primary residence, and school setting. The following relevant evidence was adduced at trial.

¶ 20    The petitioner testified that she moved to the Virgin Islands in November 2009. Shortly thereafter, she met the respondent and the two began dating. They were engaged in January 2012 and the engagement lasted for approximately two years. The parties never married. Their daughter, T.A.V., was born on September 19, 2012. Due to pregnancy complications, the petitioner delivered T.A.V. five weeks early in Maryville, Illinois. Two and a half weeks after T.A.V.'s birth, the parties drove to Virginia and then returned to the Virgin Islands.

¶ 21    In January 2014, the petitioner moved back to Illinois with T.A.V. and has resided there ever since with her daughter. From January 2014 to July 2014, the respondent exercised his parenting time only one time during a week-long ski trip in March 2014. From September 2014 until May 15, 2015, the respondent neither requested nor exercised any parenting time with T.A.V. After May 15, 2015, and the entry of the joint parenting agreement, the respondent exercised all

8

parenting time, except when prevented from doing so by two hurricanes that occurred in 2017 in the Virgin Islands.

¶ 22    The petitioner is employed as a bartender two days a week in Illinois. When she is working, her mother, Pam, T.A.V.'s maternal grandmother, watches T.A.V. overnight. The petitioner indicated that she has looked for full-time employment but believed it would be too difficult to handle in conjunction with the pending legal proceedings. According to the petitioner, the respondent only "occasionally" called T.A.V., even though he was given 10 minutes per day to talk with her, and the petitioner often interacted with nannies employed by the respondent, when on phone calls or while using "FaceTime."

¶ 23    Since August 2018, when the May 15, 2015, joint parenting agreement delineating the parenting time schedule ended, the respondent had not exercised parenting time in Illinois, despite the petitioner asking him to visit multiple times. In December 2018, the petitioner requested that T.A.V. return to Illinois before the conclusion of the respondent's parenting time so that T.A.V. could attend and participate in a Christmas concert at GSLS. The respondent complied with the petitioner's request but did not attend the concert himself. A photograph was admitted into evidence showing the respondent and friends on a boat on Christmas Day drinking with no children around. Four photographs were admitted into evidence of T.A.V. on the respondent's boat while not wearing a lifejacket, and one photograph of T.A.V., according to the petitioner, swimming nude in the respondent's mother's pool. The petitioner also indicated that, despite her request, the respondent did not send additional money for school tuition outside of regular monthly child support payments. The petitioner indicated that she consistently received child support payments from the respondent.

¶ 24    The petitioner testified that she chose GSLS even though she identified as a Buddhist and the respondent was not Lutheran. She testified that she had different beliefs than what GSLS valued and taught its students. The petitioner then expressed concern about Rossman School in Creve Coeur, Missouri, a school she had only visited one time, given the significant daily travel time from Collinsville, Illinois, and the fact that no students near T.A.V.'s hometown attended that school. The petitioner admitted that she had never conferred with an educational specialist regarding schooling for T.A.V.

¶ 25    The petitioner further testified that based on internet research and other people's reviews, she was strongly opposed to T.A.V. attending Antilles School in the Virgin Islands because students there were not prepared to graduate from elite colleges. The petitioner agreed that she and the respondent had initially planned to raise T.A.V. in the Virgin Islands. Additionally, the petitioner acknowledged that, from a career standpoint, she had "fewer roadblocks" than the respondent to relocate. The petitioner also testified she has maintained friendships in the Virgin Islands and acknowledged that job opportunities with past employers could be possible.

¶ 26    The petitioner stated that she was aware that the respondent had purchased a condo for her in the Virgin Islands, but she preferred to live near the St. Louis area. The petitioner acknowledged that children are well served by frequent access to both parents. She also acknowledged that if the court granted the respondent the majority of parenting time, she would be willing to move to the Virgin Islands to be close to her daughter. The petitioner stated that no economic factors, such as a car or home, would affect her decision to move to the Virgin Islands. The petitioner testified that she believed that the current situation best served T.A.V.'s interests.

¶ 27    The respondent testified that he and the petitioner were engaged on January 1, 2012, and discovered that the petitioner was pregnant with T.A.V. in March 2012. The couple had planned

10

to reside in the Virgin Islands after T.A.V. was born. He pointed to their preparation in furnishing a nursery in the home they shared, establishing with a physician in the Virgin Islands, and receiving prenatal instruction from Linda Caiger at Antilles School as evidence of this intention. While in Illinois for her baby shower, however, T.A.V. was born five weeks early after the petitioner experienced medical complications. The couple stayed in Illinois for approximately 10 days after T.A.V.'s birth. They then drove to Virginia to visit family before they flew to the Virgin Islands. The couple lived together in the Virgin Islands until 2014.

¶ 28    The respondent then testified that in January 2014, following a family trip to England, the couple had a "major argument." As previously planned, the respondent returned to the Virgin Islands, and the petitioner traveled with T.A.V. to Illinois for a temporary visit with her family. While in Illinois, however, the petitioner developed medical issues and was hospitalized for two to three months. The respondent admitted that he never visited Illinois during this time. In fact, from January 2014 until July 2014, the respondent exercised one period of overnight parenting in March 2014 for a family ski trip.

¶ 29    According to the respondent, during this time, there were discussions about T.A.V. returning to the Virgin Islands despite the couple not being engaged. With that thought in mind, the respondent purchased the petitioner a condo near his home. The respondent testified that this condo was still available for the petitioner should she choose to move to the Virgin Islands. The respondent further testified that the first he learned that the petitioner was not going to return to the Virgin Islands was when he was served with notice of a legal proceeding regarding parenting time and responsibilities while visiting T.A.V. in Illinois.

¶ 30    The respondent admitted that the circuit court entered a parenting time order, effective September 2014 until May 15, 2015, which allotted for him to have parenting time and that he did

11

not visit T.A.V. during that time, although he had visited his current partner, Masha, in New York on a regular basis. When asked why he failed to visit during the seven-month period, the respondent stated, "I was really confused actually *** I didn't really know what happened here to be honest with you." The respondent went on to state that he never received an explanation regarding the circuit court's 2014 temporary parenting time order, and that the order "gave me long weekends like I lived next door."

¶ 31　Following the entry of the May 15, 2015, joint parenting agreement, the respondent only missed parenting time with T.A.V. during two hurricanes in 2017 that impacted the Virgin Islands. He claimed that although he requested makeup parenting time with T.A.V., the petitioner refused. The respondent testified that it took him nearly three days traveling every time he flew from the Virgin Islands to St. Louis, because of a required layover in New York. He further stated that the petitioner never met him halfway or offered to bring T.A.V. to the Virgin Islands to accommodate his schedule. Traveling to and from Illinois presented the respondent with a challenging situation because he ran several businesses and was forced to leave his other two children and partner at home. The respondent also spent time with T.A.V. in Illinois in a hotel room over long weekends, but he testified that he did not "feel like raising a child from a hotel room [wa]s an appropriate way of doing things."

¶ 32　Next, the respondent expressed concern about GSLS, especially since the petitioner enrolled T.A.V. without his consent. The respondent testified he was against T.A.V. attending GSLS because it was "ultra-religious," teaching concepts such as creationism, opposition to gay marriage, "Jesus songs," and an emphasis on praying three times a day. The respondent admitted that he never visited GSLS and did not pay the tuition. The respondent also testified regarding his

12

opposition to the Rossman School, another private school in the St. Louis Metropolitan area, for various reasons.

¶ 33    The respondent instead believed Antilles School was the best fit for T.A.V. The respondent testified that he had attended Antilles School, which he believed was a close-knit community in the Virgin Islands that T.A.V. could attend with her two half siblings. T.A.V. had previously participated in an "interaction day," where she visited the school and participated in school events, such as field day and a food fair. T.A.V. was already scheduled to attend Antilles School the following summer with her younger sister, Meja, for summer camp. The respondent testified that he learned T.A.V. had been enrolled at GSLS just one week before she started kindergarten, and in response, he enrolled T.A.V. at Antilles School and paid tuition to hold her seat. Although T.A.V. did not attend Antilles School, T.A.V. had a spot reserved for her for the upcoming school year.

¶ 34    The respondent testified that believed it was in T.A.V.'s best interest for both him and the petitioner to "see [T.A.V.] basically weekly and alternate weekends and be a part of her life almost every week." Although the respondent expressed his opinion that the petitioner had failed to compromise with respect to T.A.V.'s best interests, he believed he had adequately demonstrated his willingness to make decisions in T.A.V.'s best interest. Specifically, he testified that he had flown nearly "21 hours every time to get my daughter" because he believed T.A.V. needed "both parents." The respondent expressed concern that T.A.V. would be compromised because she needed both parents and her two siblings. Specifically, the respondent testified that Meja, T.A.V.'s sister, and T.A.V. were inseparable.

¶ 35    T.A.V. also had a great relationship with her grandparents, Oma, the respondent's mother, and Barry, Oma's life partner, who often saw and cared for the children. The respondent testified

13

that a typical workday finished at 5:30 p.m. and he arrived home for family dinner by 6:30 p.m. The respondent admitted that there were several photos of T.A.V. in a moving boat without a life jacket on, although he indicated she was a good swimmer and the boat rides were short in duration.

¶ 36    Mariya Brueva (Masha), the respondent's partner, testified that she and the respondent started dating in September 2014 while she was living in New York. Masha and the respondent lived in the Virgin Islands with their two children, Meja and Aiden. Masha indicated that she had a close relationship with the respondent's family. She testified that Opa and Oma usually visited the Virgin Islands from Virginia at least once a month for a week or more at a time. According to Masha, Oma had a close relationship with her grandchildren, including T.A.V. Further, all three children, T.A.V., Meja, and Aiden, also adored their uncles Jeremy and Adrien, who they saw quite frequently and lived nearby.

¶ 37    Masha described her relationship with T.A.V. as "[v]ery close," claiming that "[s]he tells me all her secrets." Masha stated that Meja and T.A.V. were inseparable, so when T.A.V. left the Virgin Islands, they called each other and used FaceTime to stay in touch. Masha testified that the siblings all loved each other and missed one another when T.A.V. was away.

¶ 38    She confirmed that the respondent had employed a nanny for help on a limited basis, but that she cooked for the children. The couple, together, transport the children to their activities and school, take the children to doctors' appointments, schedule their extracurricular activities, and put the children to bed at night. She confirmed that the respondent works Monday through Friday from 9 a.m. to 5:30 p.m., and he was normally present for breakfast and dinner with the children.

¶ 39    Masha admitted that on one occasion while T.A.V. was visiting the Virgin Islands, Oma and Opa watched the children in Virginia while she and the respondent went on vacation with friends in the summer of 2016. In terms of traveling, she claimed that the respondent did not travel

14

often for work, only "[o]nce [or] twice a year," and would be gone for a maximum of three or four days. Masha described the travel arrangements for parenting times as complicated, stating that the respondent usually traveled close to four days, two days each way, to pick up and drop off T.A.V. In her opinion, T.A.V. "spends more time in the hotels and her flights instead of spending time with her sister" and the rest of their family.

¶ 40   Masha then described a period from January 2019 to April 2019 when the respondent did not see T.A.V. Masha stated that it was "painful after one month because [T.A.V.] was asking when she could come visit and we had no answer. So it was really awkward." Masha described this situation as "emotionally and physically exhausting" and difficult to see Meja concerned about T.A.V. and constantly asking about her.

¶ 41   Jeremy Austin, the respondent's younger brother, testified that he lived approximately five minutes from the respondent in the Virgin Islands. He sees the respondent's children a few times a month. Jeremy testified that he also went to Antilles School and then attended the University of Miami. Jeremy stated that he had a "[r]eally good" relationship with T.A.V. and that she had become more affectionate as she aged. Jeremy indicated that Meja and T.A.V. had a great relationship. Jeremy also indicated that their family lived within minutes of each other. Jeremy testified that the petitioner and T.A.V. moving to the Virgin Islands would offer the "best opportunity for [T.A.V.] to have both of her parents in her life on a consistent basis, and for her to not be traveling all the time, putting that stress on herself and on [respondent]." Specifically, Jeremy indicated that his family had seen T.A.V. far less the past year since she started kindergarten, which caused stress and frustration for the respondent.

¶ 42   Adrien Austin, also the respondent's brother, testified that he lived minutes from his brothers. Adrien attended Antilles School and then attended Emory University. Regarding Antilles

15

School, Adrien described it as a close community with much diversity and very dynamic field trips provided to the students. Adrien felt more than adequately prepared to graduate from Antilles School and attend college. He testified that 100% of his graduating class attended college, including Harvard, Penn, and Stanford. Adrien has a good relationship with T.A.V. and described T.A.V.'s relationship with the entire family as having "a lot of love and enthusiasm in all directions."

¶ 43    Inge Austin Verweij (Oma), the respondent's mother, testified that she lives both in Virginia and the Virgin Islands. Oma stated that she travels quite frequently to the Virgin Islands to see all her grandchildren, especially when T.A.V. visits. Oma testified that it would be "impossible" for the respondent to move to Illinois because of his businesses, and she claimed the petitioner "hated Illinois" based on past conversations. Oma claimed that before T.A.V. started kindergarten, she was able to see her more often. On two separate occasions, Oma picked up T.A.V. in St. Louis to reduce the travel time for the respondent and T.A.V.

¶ 44    Oma testified that she sent all her sons to Antilles School. She also stated she believed the school is very diverse and provides a community where graduates are set up to attend college. Oma believed her relationship with T.A.V. was "very good," that T.A.V. and her siblings adored each other, and that Masha provided comfort for her when T.A.V. was in the Virgin Islands. Oma described the respondent as a good father. Oma also testified that after the parenting schedule changed in 2019, it was very stressful on the respondent and the rest of the family when T.A.V. was absent for several months. When T.A.V. is missing, Oma described the family dynamic has "one empty spot." She went on, "We all do our stuff together, but then this one girl is just missing."

¶ 45    Kristine Krause, T.A.V.'s kindergarten teacher at GSLS, testified that T.A.V. was a great student who performed well on exams. Krause was familiar with the petitioner because the

16

petitioner dropped off and picked up T.A.V. from school, attended and participated in field trips, school activities, and from parent teacher conference meetings. The petitioner had informed Krause that she shared T.A.V.'s report card with the respondent.

¶ 46 Krause further testified to the specifics of GSLS's core values. Specifically, students participated in religious learning or "Jesus time," prayed three times a day, attended chapel services, and recited the pledge of allegiance to the Christian flag. An item provided on a student's report card included whether the student attended mass or Sunday school each weekend. Additionally, Krause testified that GSLS teachings were taught from a Christian point of view, which subscribed to the doctrinal position of the Lutheran Church Missouri Synod, and believed in literal creationism, anti-homosexuality principles, and anti-abortion principles.

¶ 47 John Mayhem, the principal at GSLS, testified that he met the petitioner prior to T.A.V. beginning school and informed her of the religious nature of the curriculum at GSLS. Mayhem testified that non-Christians do enroll and attended school at GSLS. Mayhem indicated that those children attend religion class and receive the same curriculum as all other students.

¶ 48 Dr. Burdick, a clinical and educational psychologist, testified as an educational expert for the respondent. Dr. Burdick was hired to assess GSLS and Antilles School, but Rossman School, among others, were later added. Regarding GSLS, Dr. Burdick visited the school for approximately 1 hour and 15 minutes. When he spoke with Mr. Mayhem, Dr. Burdick was informed that "[the petitioner] wasn't involved," and that the respondent "was there at the beginning and that he wasn't really there." Dr. Burdick did not have an opportunity to meet with T.A.V. during his assessment. With respect to GSLS's strengths as a school for T.A.V., Dr. Burdick indicated that "it was a uniform, structured religious school program that offered students a safe refuge." The school's instruction was "more or less direct instruction versus say cross

17

collaborative or project oriented." Specific weaknesses included a potential lack of support for students with learning or behavioral issues. Additionally, a child who learned better with a project-oriented methodology could have trouble learning with the school's direct approach. Furthermore, being non-Christian could be a weakness for those children and their families.

¶ 49    Regarding Antilles School, Dr. Burdick visited for approximately 2 hours and 30 minutes. While at Antilles School, Dr. Burdick spoke with several individuals, from administrators to teachers, a school psychologist, and staff. In describing the school, he stated that there was "a lot of activity there. The school itself has—it's very colorful. There's a lot of project-oriented activity. *** There's quite a lot of activity in terms of the theater and music." The student population was ethnically diverse and would offer T.A.V. a school with much familiarity, given that the respondent, his brothers, and T.A.V.'s half sibling attended or currently attend, which could benefit T.A.V.

¶ 50    Antilles School uses a project orientation methodology, which helps bring together the students, with a cross collaborative approach between the classrooms. More specifically, Dr. Burdick stated the following:

> "Well, one thing that is unique about the Antilles School is that it's part of a community. So that community is one where parents know each other, students know each other, families know each other. So in that way you're a part of—you're a cog in the wheel. So you're a part of that community."

Dr. Burdick also noted that the teachers had been employed for 10 to 30 years, and the school experienced low turnover among staff and teachers.

¶ 51    Dr. Burdick believed specific strengths of Antilles School included a very welcoming community, a mission focused on enrichment, and attention to promoting diversity within the

18

school's population. Dr. Burdick believed the principles and teaching methodology at Antilles School helped facilitate "moral judgment," "problem solving," and "group belonging or membership." Dr. Burdick also believed Antilles School "outpaces [GSLS] in providing a sequential integrated academic focus. *** It's a manner in which they approach education that follows them through their grade development at that early stages." Overall, Dr. Burdick opined that Antilles School would provide T.A.V. "the support and integrated studies within a community setting. Given the fact that she is already familiar with an international education academic piece, *** it would make the most sense."

¶ 52    Dr. Burdick also assessed Rossman School. He drove to the school, which took him approximately one hour from Collinsville, Illinois, without traffic or any significant weather. When discussing enrollment with an administrator during his visit, Dr. Burdick was informed that the petitioner had visited the school one time but had not filed an application or paid a deposit to enroll T.A.V. Dr. Burdick described Rossman School as a "pressure cooker" for a child with a highly verbal skill set and a school where kids are "kind of like gunners." Additionally, Dr. Burdick emphasized how important it was "for both parents to be present. It affects kids *** [presenting] a safe place to learn."

¶ 53    Following the close of evidence, the circuit court made an oral ruling denying the respondent's request for relocation of T.A.V. The circuit court went on to award the petitioner the majority of parenting time and to determine that T.A.V.'s primary residence would be with the petitioner. The court noted that the parties had joint decision-making responsibilities, so they were to come to an agreement on which school T.A.V. would attend in the Greater Metropolitan St. Louis area.

¶ 54    On July 31, 2019, the circuit court entered its written order. The court recognized that section 602.7(b) of the Marriage Act (750 ILCS 5/602.7(b) (West 2016)) codified 17 factors a court should consider when determining the best interests of a minor child in allocating parenting time. The court, here, determined that factors 1 through 9 and factors 12 and 13 were relevant and applicable.

¶ 55    The court found that factor one, the wishes of each parent seeking parenting time, favored the petitioner. While the petitioner requested the court order the child attend school in the Greater Metropolitan St. Louis area and the respondent receive parenting time during the summer and on holiday breaks, the respondent requested an equal splitting of parenting time in the Virgin Islands or a gradual parenting schedule that gave the petitioner the majority of parenting time with a transition to equal time for the parties. The circuit court, recognizing that it had no authority to order the petitioner to the Virgin Islands, found in favor of the petitioner's wishes because an order in accordance with the respondent's wishes would be "beyond the authority available to this court."

¶ 56    Factor two, the wishes of the child, favored neither party because the court never appointed a guardian *ad litem*, and the only third party who met with T.A.V. was Dr. Cuneo, who the petitioner later withdrew as a witness prior to the close of evidence.

¶ 57    Factor three, the amount of time each parent spent performing caretaking functions within the last 24 months preceding the filing of any petition for allocation of parental responsibilities, favored the petitioner. The court noted that the petitioner had been T.A.V.'s primary caretaker and had a schedule "tailored around the minor child," whereas the respondent had not provided such caretaking. Moreover, the court stated the following regarding the respondent's work schedule:

    "[H]is work schedule prevents him from being present when the child is home from school. It prevents him from picking up the child from school. His work schedule requires him to

20

rely on Masha to provide the care for the child while he is at work. \*\*\* While [the petitioner] also relies on a third party, her mother, when working, this reliance is far less than [r]espondent's reliance, simply because of the amount of available time each has to devote to the child. \*\*\* [T]he simple fact is [p]etitioner has the time available while [r]espondent does not."

¶ 58 Factor four, any prior agreement or course of conduct between the parties relating to caretaking functions with respect to the child, favored the petitioner because she had been the primary caretaker for the child from its birth to present and had primarily been responsible for scheduling and attending doctor, dentist, and medical appointments. Further, the court noted that, despite having available parenting time with T.A.V. from September 2014 to May 2015, the respondent only exercised overnight parenting time while in Disney World in October 2014.

¶ 59 Factor five, the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests, slightly favored the respondent. The petitioner's mother, Pam, sees T.A.V. on a regular basis and her Aunt Linda visited with T.A.V. on a limited basis. Moreover, the petitioner has family close by and in other parts of the country. The respondent, however, has an extensive family in the Virgin Islands, which includes his partner, Masha, T.A.V.'s half siblings, Meja and Aiden, the respondent's brothers, Jeremy and Adrien, and Oma and Opa, who visit often.

¶ 60 Factor six, the child's adjustment to his or her home, school, and community, slightly favored the petitioner because T.A.V. "appears to have adjusted quite well with the current arrangement" of her living in southern Illinois and attending GSLS. The court reached this determination because T.A.V. has friends at school, participates in GSLS activities, and appears to be a disciplined child. Although Dr. Burdick opined that Antilles School was a better fit, after

21

visiting GSLS, Rossman, and Antilles, the court stated it had difficulty accepting his opinion, "in large part due to the fact that he never met with the child." Moreover, the court determined that Dr. Burdick's "investigation, research and interviews were rushed *** [and] incomplete."

¶ 61    Factor seven, the mental and physical health of all individuals involved, was neutral for both parties.

¶ 62    Factor eight, the child's needs, was neutral because both parties were meeting the emotional and physical needs of T.A.V. when the child was in their respective care.

¶ 63    Factor nine, the distance between the parties' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement, favored the petitioner. The court's order recognized that the respondent's travel time to and from Illinois was substantial, taking approximately three days to retrieve or drop off T.A.V. However, the court noted that "it would be the same if the majority of parenting time was awarded to [r]espondent." The court determined that the petitioner's schedule was more flexible than the respondent's because he owns several businesses and works five days a week until 5 p.m. or 5:30 p.m. Further, both parents had demonstrated an ability to cooperate in the travel arrangements pertaining to parenting time, and the petitioner has consistently placed T.A.V.'s needs to see the respondent, besides the family ski trip in March 2019, above her own desires to be with T.A.V.

¶ 64    Factor 12, the willingness and ability of each parent to place the needs of the child above his or her own needs, favored the petitioner. The circuit court stated that the respondent had failed to visit GSLS, except for one time when he was in the area for legal proceedings, did not attend T.A.V.'s Christmas concert, did not assist financially with paying school tuition, and lacked involvement with T.A.V.'s teacher, other than sending a few emails. The court opined that the

22

respondent's lack of involvement was distance related, but also because he wanted T.A.V. to attend Antilles School. The court also determined that the respondent did not put T.A.V.'s needs above his own when he failed to visit Illinois in early 2014 while the petitioner was hospitalized, leaving T.A.V. in the care of her maternal grandmother. Additionally, the court determined that the petitioner was actively involved in T.A.V.'s school functions and extracurricular activities.

¶ 65    Lastly, the court found that factor 13, the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, was neutral between the parties. The court determined that each party facilitated and encouraged T.A.V. to have a strong relationship with one another.

¶ 66    Based on the factors above, the court granted the petitioner's motion to modify, awarding her the majority of parenting time and designating the petitioner's home as T.A.V.'s primary residence. The court determined that T.A.V. would attend school in the Greater Metropolitan St. Louis area, directing the parties to make the school determination together. The respondent was awarded the entirety of the summer, beginning seven days after school ends and concluding seven days prior to school commencing, with the petitioner allowed parenting time during the summer for a period of five days in the Virgin Islands in 2019 only. The respondent was also awarded parenting time in the Greater St. Louis Metropolitan area at least 1 weekend per month with 72-hour notice, every spring break and Easter break, and all 3-day weekends to be exercised in the Continental U.S. with a 7-day notice provided to the petitioner. The parties were to equally divide Christmas break between themselves. The court then denied the respondent's petition for relocation and designation as custodian and motion for declaratory judgment. The respondent filed a timely notice of appeal.

¶ 67                                    II. ANALYSIS

¶ 68                           1. Allocation of Parenting Time

¶ 69    The respondent on appeal raises the issue as to whether the circuit court erred in its determination regarding the allocation of parenting time between the parties. Specifically, the respondent claims that the circuit court erred when it determined that it was in the best interests of T.A.V. that the petitioner be awarded the majority of parenting time and then issued an order that T.A.V. continue to reside in southern Illinois and attend school in the Greater Metropolitan St. Louis area instead of finding in favor of the respondent.

¶ 70    "Section 602.7 of the [Marriage] Act requires a court to allocate parenting time in accordance with the best interest of the child." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 14. The circuit court in determining the best interests of the child for purposes of allocating parenting time must consider all relevant factors, including, without limitation, those listed in section 602.7(b). Section 602.7(b) lists the following nonexclusive factor list:

        "(1) the wishes of each parent seeking parenting time;

        (2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

        (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

        (4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

        (5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.7(b) (West 2016).

¶ 71     "Because the trial court is in the best position to assess the credibility of witnesses and determine the child's best interests, its decision regarding the allocation of parenting time must be accorded great deference." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 15 (citing *In re Marriage of Debra N.*, 2013 IL App (1st) 122145, ¶ 45). A reviewing court "will not overturn the trial court's decision unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence." *Id.* "A judgment is against the manifest weight of the evidence only if an opposite conclusion is apparent or if the findings appear unreasonable, arbitrary, or not based on the evidence." *Id.* ¶ 21.

¶ 72     In this matter, the respondent does not allege that the circuit court failed to apply the statutory best interest factors listed in section 602.7. Instead, the respondent argues that the circuit court weighed the factors "in a way that disregarded and/or minimized the great preponderance of the evidence in support of [the respondents]'s position," and thus, made a determination that was against the manifest weight of the evidence and must be reversed.

¶ 73     In reviewing the respondent's allegations, we turn to the circuit court's findings and the evidence presented at trial to determine if the evidence, in fact, suggests "an apparent opposite conclusion" than that found by the circuit court or that the findings appear to be "unreasonable, arbitrary or not based on the evidence." In short, we find that the circuit court's findings are not unreasonable or arbitrary and that an opposite conclusion is not apparent.

¶ 74     First, we note that the circuit court's July 31, 2019, order as to allocation of parenting time and the respondent's request for relocation of the minor child is a thorough 46-page document that summarizes the evidence and the court's findings, including its analysis of the best interests

factors, in significant detail. Again, the issue presented is not whether the circuit court considered the evidence, as clearly demonstrated by its final judgment order, but whether it did so properly.

¶ 75    The evidence presented at trial demonstrated that the petitioner was the primary caregiver for T.A.V. from the time of her birth until the circuit court rendered its decision, including during the 24-month statutory period preceding this action. T.A.V.'s primary residence from the time of her birth until the court's decision was in Illinois with the petitioner, apart from approximately 15 months when the parties lived in the Virgin Islands following T.A.V.'s birth. Some of the petitioner's family lives in Illinois which allows them to visit with T.A.V. The petitioner's mother, Pam, lives just minutes away from the petitioner. Pam sees T.A.V. on a regular basis, caring for her two nights a week, and the two have a close relationship. Also, the petitioner's aunt, Linda, lives nearby. Linda has cared for T.A.V. overnight on at least 3 occasions, picked T.A.V. up from school on 10 occasions, and dropped her off at school a "couple times." Evidence demonstrated that T.A.V. is a well-adjusted child who is well-rounded and well-behaved. She has developed friendships at GSLS and has received good grades thus far. All of this has occurred while her primary residence has been in Illinois with the petitioner, with regular visits to the Virgin Islands to visit the respondent. Additionally, the evidence showed the petitioner displayed a willingness and the ability to place the needs of the child ahead of her own needs as the petitioner is actively involved in the child's school activities and takes care of the child when she is not working or the child is not with the respondent. Finally, the petitioner has more time to devote to the child as her work schedule is not as demanding as the respondent's schedule and does not require travel.

¶ 76    While all the evidence above supports the circuit court's final determination, we do acknowledge that other evidence weighed in favor of the respondent. Specifically, T.A.V.'s half siblings reside in the Virgin Islands and the respondent has a close-knit family that resides there

27

as well. Further, the only expert testimony regarding the appropriateness of various schools for T.A.V. opined that Antilles School was the best fit out of those examined.

¶ 77    The circuit court did find that the respondent clearly loved his daughter, met her physical and emotional needs, and that both parents worked to foster strong relationship between T.A.V. and the other parent. However, some additional evidence was presented by the petitioner, and considered by the circuit court, which weighed against the respondent. This includes a period between September 2014 and May 2015 in which the respondent did not exercise any parenting time with T.A.V., despite being awarded such time, other than a trip to Disney World in October 2014 where the petitioner was also present. The respondent contends that the trial court's consideration of this time period was improper because it occurred outside of the 24-month time period set forth in the best interests factors. However, the respondent fails to cite any case law which expressly prohibits a court from considering such activities beyond the 24-month period noted in the Marriage Act. Contrary to the respondent's argument, the plain language of section 602.7(b) states that the circuit court is to "consider all relevant factors, including, *without limitation*," the factors outlined in the Marriage Act. (Emphasis added.) 750 ILCS 5/602.7(b) (West 2016). Further, the final factor on the best interests list is "any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b)(17). It has long been the law in Illinois that a circuit court has broad discretion to consider all information that may be relevant to the best interests factors when making its determination. *In re Marriage of Petraitis*, 263 Ill. App. 3d 1022, 1031 (1993). Assuming, *arguendo*, it was improper for the circuit court to consider the September 2014 through May 2015 time period, it resulted in harmless error because when examining only the 24 months prior to the filing of the petition, the same conclusion is apparent because the petitioner

28

was the primary caregiver during that time period. Thus, the circuit court still would have found that factor favored the petitioner.

¶ 78    The petitioner also presented evidence that while T.A.V. was in the care of the respondent, his partner, Masha, cared for T.A.V. during the day while he was at work. Additionally, the petitioner testified that on occasion, a nanny or the respondent's parents cared for T.A.V., including a specific instance where the respondent's parents cared for T.A.V. while the respondent and his partner vacationed out of the country in the summer of 2016. The respondent disputes these claims and argues that the circuit court held his employment against him when weighing this factor. We disagree. The circuit court did not fault the respondent for his employment, but properly considered the reality of the amount of time the respondent would have to care for the child and compared it to that of the petitioner. The court stated specifically, "[w]hile this [c]ourt understands and acknowledges that [r]espondent has to work, just as [p]etitioner does, the simple fact is [p]etitioner has the time available while [r]espondent does not."

¶ 79    As to the issues regarding conflicting testimony and evidence, "[an appeals court] will not second guess the trial judge's determinations regarding credibility of witnesses." *In re Marriage of Petraitis*, 263 Ill. App. 3d at 1035. Further, "[i]t is not the function of this court to reweigh the evidence or assess the credibility of testimony and set aside the trial court's determination merely because a different conclusion could have been drawn from the evidence." *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992). Thus, the circuit court having considered the statutory factors in light of the evidence presented and having possessed a superior vantage point for evaluating the temperaments, personalities, capabilities, and credibility of the petitioner and the respondent decided that, while both parents are fit and proper to have parenting time, it is in

29

T.A.V.'s best interests that the petitioner be allocated the majority of parenting time. Considering all the above, the circuit court's decision was not against the manifest weight of the evidence.

¶ 80                                                    2. Relocation of T.A.V.

¶ 81    The respondent also argues that the statutory relocation factors outlined in section 609.2 of the Marriage Act (750 ILCS 5/609.2 (West 2016)) overwhelmingly support a finding that T.A.V.'s relocation to the Virgin Islands was warranted. The best interests factors outlined under section 609.2(g) overlap, in many respects, with those set forth in section 602.7(b). Based upon the in-depth analysis performed by the circuit court, it appears that all the best interests factors in section 609.2(g) were addressed, even though the respondent's petition to relocate was untimely. Specifically, the respondent's argument fails because section 609.2 has certain conditions precedent to the filing of a motion to relocate. The statute clearly states that a parent who petitions to relocate a child must have been allocated equal parenting time or a majority of parenting time in order to file a petition to relocate with the child. *Id.* § 609.2(b).

¶ 82    The petitioner claimed respondent lacked "standing" to file such a petition, and in the circuit court's July 25, 2018, order, the court agreed and found:

> "6.    Respondent ultimately seeks permission to relocate the minor child to the Virgin Islands. That relocation is controlled by 750 ILCS 5/609.2. As to standing the statute provides as follows: (b) A parent who has been allocated a majority of parenting time or either parent who has been allocated equal parenting time may seek to relocate with a child.
>
> 7.    That respondent does not currently having [*sic*] standing to seek relocation, as defined by by [*sic*] Section 609.2. *** The Court shall consider the requirements of Sections 610.5 and 609.2 as they apply to the best interests standard of said sections ***."

Importantly, we note that the conditions set forth in section 609.2 do not relate to whether respondent had "standing" to file the petition. Rather, the statute simply contains certain conditions precedent to the filing of the motion. Here, as the circuit court found and as was demonstrated by the allocation of parenting time listed in the May 15, 2015, joint parenting agreement, the respondent had never been allocated equal parenting time or a majority of parenting time and could not meet the statutory criteria for the filing of a petition to relocate the minor. The respondent's only course of action was to file a motion to modify. For the foregoing reasons, we affirm the circuit court's ruling on this issue.

¶ 83                           3. Burden to Show Substantial Change in Circumstances

¶ 84    The respondent's final alleged circuit court error is that it improperly placed a burden on him to show a substantial change in circumstances prior to modification and this burden left him disadvantaged when the court considered the best interests factors. The respondent does not point to any specific ruling or aspect of the circuit court's analysis; instead he merely references a July 25, 2018, circuit court order in which the circuit court found that the parties had not agreed in the May 15, 2015, joint parenting agreement to a modification of T.A.V.'s parenting schedule or place of residency and also found "[t]hat the respondent has the burden to plead and prove that a change in circumstances has occurred since May 15, 2015, and that a modification is necessary to serve the minor child's best interests." However, despite the inclusion of this statement of the law by the circuit court, it appears based upon the court's final judgment and its subsequent actions that the circuit court either found that the respondent had met that burden or that the parties had agreed to a modification.

¶ 85    Assuming, without deciding, that the circuit court was correct in its determination that the language contained in the May 15, 2015, joint parenting agreement did not constitute an agreement

31

to modify by the parties, it is apparent from the following facts: (1) there was no current parenting time schedule in place; (2) the most recent parenting schedule expired per the joint parenting agreement; (3) the parties lived a significant distance apart; and (4) both parties had pending motions to modify that the circuit court had no choice but to modify the parenting time schedule. Further, the petitioner, in her brief, concedes that the respondent "did not need to demonstrate a substantial change in circumstances and that modification was necessary to serve [T.A.V.'s] best interests." Also, the circuit court itself acknowledges as much in the very same July 25, 2018, order when the judge stated he "intend[ed] to address both the issues of modification of the parenting time schedule, the residence of the child and the relocation in one hearing."

¶ 86   Our supreme court in *In re Marriage of Lasky*, 176 Ill. 2d 75, 81 (1997), held:

> "When, as here, both parties seek to terminate joint custody and stipulate that a change in circumstances has occurred, it is a given that a change in circumstances has occurred. At that juncture the court should move directly to consider what custody modification is in the child's best interests."

¶ 87   That is exactly what we find the circuit court did in this case. After the July 25, 2018, order was entered, a date was set for the final hearing and a trial occurred where the court considered all the evidence the parties wished to present. Then, as evidenced by the circuit court's detailed final order, the court discussed the best interests factors and proceeded with its analysis of each one. If the circuit court had placed a burden on the respondent to prove a substantial change in circumstances, the burden would have been discussed somewhere in the 46-page detailed final judgment order. Further, if the court did, in fact, place such a burden, it clearly felt that the respondent had met the burden considering the court considered all of the relevant best interests

factors and then actually modified the agreement, although not in the manner desired by the respondent.

¶ 88    Ultimately, "the trial court is presumed to know the law and apply it properly." *People v. Howery*, 178 Ill. 2d 1, 32 (1997). "However, when the record contains strong affirmative evidence to the contrary, that presumption is rebutted." *Id*. Therefore, unless we have a record affirmatively showing the circuit court improperly applied the law, we must presume it knew and applied it properly. Thus, here, we find the circuit court did not place an unwarranted burden on the respondent and disadvantage him during its consideration of the best interests factors.

¶ 89                                    III. CONCLUSION

¶ 90    For the foregoing reasons, we affirm the July 31, 2019, order of the circuit court of St. Clair County.


¶ 91    Affirmed.


¶ 92    JUSTICE BARBERIS, dissenting:

¶ 93    Respectfully, I dissent from the majority's opinion. After carefully reviewing the record and considering the parties' respective arguments, it is my opinion that the circuit court's order was against the manifest weight of the evidence.

¶ 94    The record supports that Mario and Kristina appear to be loving, concerned parents. Similarly, there is little to no testimony set forth that displays or implies disturbing conduct that would cause me to believe that one or both of the parents were unfit to parent the minor child, T.A.V. Instead, in departing from the majority's opinion, I believe the best interest factors, contrary to the circuit's court order, weighed more heavily in Mario's favor for the following reasons.

33

¶ 95    First, Mario is a father who desperately desires to be actively involved in T.A.V.'s life. In fact, his testimony showed that he adequately demonstrated commitment to T.A.V., despite Kristina's argument and the circuit court's determination that Mario had failed, unlike Kristina, to place T.A.V.'s needs above his own. Based on an extensive review of the record, I disagree with the court's assessment of factor 12. Rather, the relevant facts demonstrate that Kristina, unbeknownst to Mario, traveled to Illinois with their infant daughter in 2014, after T.A.V. had lived in St. Thomas for approximately 15 months following her birth. Kristina had no intention to return to St. Thomas, despite the couple's discussions that T.A.V. would be raised in St. Thomas.

¶ 96    Moreover, for years now, Mario has traveled nearly three days at a time to exercise his parenting time with T.A.V. in St. Thomas and/or hotel rooms in Illinois. Although the court believes Kristina has exemplified a great level of compromise, as evidenced by the court's analysis under factor nine, testimony demonstrates that Kristina never met Mario halfway or offered to travel to St. Thomas to accommodate him, even though he works full time, owns several businesses and has two small children to care for in St. Thomas.

¶ 97    Additionally, although the court acknowledged Mario's substantial travel time and costs, the court reasoned that Kristina would be subjected to the same travel time if Mario was awarded majority parenting time. I disagree. First, Kristina testified that, after hearing the evidence at trial, she was "somewhat more willing to consider *** personally moving back to the Virgin Islands." In fact, Kristina admitted in her testimony that she would move to the Virgin Islands if T.A.V. was court ordered. Kristina also acknowledged, and Mario's testimony demonstrated, that Kristina would be provided a free condo, a car, and airline tickets to fly to and from Illinois if she moved to the Virgin Islands. Second, Kristina admitted that, in comparison to Mario, she had "fewer roadblocks *** from a career standpoint in terms of *** relocating." Moreover, although Kristina

34

moved from St. Thomas to Illinois in 2014, she had maintained friendships on the island and acknowledged that job opportunities for past employers could be possible if she moved back.

¶ 98    Second, the circuit court expressed concern under factor three regarding Mario's work schedule. In particular, the court noted that his work "prevents him from being present when the child is home from school. It prevents him from picking up the child from school. His work schedule requires him to rely on Masha to provide the care for the child while he is at work." Based on a review of the record, this is a misrepresentation of the facts. It appears from the court's order that, because Mario is employed, he does not have availability to care for T.A.V. I take issue with the court's determination for several reasons.

¶ 99    First, T.A.V. is a first grader, thus, she attends school on a full-time basis. If she attended Antilles School, T.A.V. would be in school from 8 a.m. to 3 p.m., sometimes until 4 p.m. or 4:30 p.m. for after school hours. According to Masha's testimony, although Mario works Monday to Friday from 9 a.m. to 5:30 p.m., he was normally present for breakfast and dinner with the children. Moreover, both Masha and Mario consistently testified that Mario quite frequently met the children after school at a local restaurant he owned for French fries and milkshakes before his work day ended at 5 p.m. or 5:30 p.m. Mario's testimony, consistent with Masha, demonstrated that a typical day in their household consisted of the following:

> "We wake up in the morning. Usually, you know, I wake them up or go in with the girls. We come out, we have breakfast as a family. And then the girls will then go *** to school usually at that point if [T.A.V.]'s not there, and I would go to work. And then, you know, I'd meet them sometimes later over at the restaurant for milkshakes and French fries after they get out of school, or I meet them at home."

¶ 100   Lastly, while the court looked at Mario's employment as a hinderance to him providing adequate care and time to T.A.V., the court noted that, although Kristina relied on her mother, Pam, to watch T.A.V. while Kristina worked, "this reliance is far less than Respondent's reliance." Based on the court's order, it is apparent that the court, again, failed to consider the substantial time Mario spent away from his career traveling in order to exercise his parenting time. Furthermore, I disagree that Kristina's work schedule was "tailored around the child," given that T.A.V. spent the night at her maternal grandmother's home two nights a week while Kristina bartended. A review of all evidence demonstrates that both parents worked outside the home and, at times, had to rely on a family member to watch T.A.V.

¶ 101   Third, in finding in favor of Kristina under factors three and four, the circuit court stated that Kristina had "provided the most consistent care for [T.A.V.] in her young life." Although this is technically true, given the distance between T.A.V. and Mario, I believe this statement presumes Mario chose not to provide care for T.A.V. Instead, the record demonstrates that Kristina, unbeknownst to Mario, visited Illinois in 2014 with no intention to move back to St. Thomas with T.A.V. This scenario left Mario with little to no options. As indicated above, Mario has many more roadblocks—professionally and personally—that make a move to Illinois almost impossible. The testimony, however, undeniably demonstrates that if T.A.V. was court ordered to move to St. Thomas, Kristina would move with her, and Mario would provide her with a condo in a gated community, a car, and airline tickets for her to fly to and from St. Thomas.

¶ 102   Fourth, Kristina acknowledged that T.A.V. would be well-served if she had both parents in her life. Kristina also admitted that T.A.V. did not have any blood-related cousins in Collinsville. Despite Kristina admitting that it was important for a child to have frequent access to both parents and a strong bond with siblings, like Kristina did with her own brother, Kristina believed the

36

current setup, which involved Mario traveling a substantial distance to see his daughter, was in T.A.V.'s best interest. I disagree.

¶ 103  Ample testimony from Mario and his family members, which included his brothers, Masha, and Oma, indicated that T.A.V. had a very loving and extensive family in St. Thomas. Kristina, however, lived close to her mother, Pam, and Aunt Linda, who had watched T.A.V. on a very limited basis, specifically, three times while Kristina worked. Kristina also had family members scattered throughout Illinois who she saw roughly five to six times per year. Despite testimony indicating that T.A.V. was inseparable with her half-sister, Meja, and adored her younger brother, Aiden, the circuit court found that factor five, the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests, "slightly favors Respondent." Although the court acknowledged that the siblings had "forged a tight bond," the court failed to highlight the testimony demonstrating separation issues that Mario and Meja had experienced and the confusion that T.A.V. had displayed between parenting time visits.

¶ 104  Lastly, regarding schooling for T.A.V., Kristina stated that she was strongly opposed to T.A.V. attending Antilles School because the students were not prepared to graduate from elite colleges. Kristina testified that she came to this determination, not based on her own personal knowledge, but internet research and other individuals' opinions, although she never specified who told her this information. Extensive testimony, however, demonstrated that Mario's family had a strong family connection to Antilles School, and that Mario and his brothers had attended elite colleges after graduating from Antilles School. In fact, Adrien Austin, Mario's brother, testified that 100% of his graduating class had attended college, including Harvard, Penn, and Stanford.

¶ 105   In finding slightly in favor of Kristina for factor six, the circuit court stated that T.A.V. "appears to have adjusted quite well with the current arrangement" because she had friends at school, took part in the Christmas concert, and was well-behaved. In making its determination, the court failed to acknowledge that Kristina did not present an educational counselor to testify in support of Good Shepherd. Regardless, the court discounted Dr. Burdick, who opined in his report and testified that Antilles School was a better school choice for T.A.V. than Good Shepherd, because he never met with T.A.V. during his assessment.

¶ 106   Moreover, the court took issue with Dr. Burdick's assessment that Rossman School was an inferior choice to Antilles School, noting that T.A.V. was "accustomed to traveling great distances for extended periods," even though Rossman School was located over one hour from her home without traffic or inclement weather. The testimony, although ignored by the court, demonstrated that Antilles School was a loving community that Mario's family had been personally involved with for a substantial number of years. Additionally, according to Dr. Burdick, Antilles School, which T.A.V. was already familiar with, presented an opportunity for her to receive a great education with her siblings in a diverse educational setting.

¶ 107   Accordingly, after an extensive review of the record, I believe the circuit court's decision was against the manifest weight of the evidence where the court determined that the factors heavily weighed in favor of Kristina and against Mario. Specifically, I believe the court's order took into consideration Kristina's best interests, not T.A.V., which should have been of paramount concern to the court in rendering its decision. As such, I believe the parties should be granted equal parenting time, and Mario's motion for relocation should be granted.